# Exhibit A

1   NICHOLS KASTER, LLP
    Matthew C. Helland, CA Bar No. 250451
2   helland@nka.com
    One Embarcadero Center, Suite 720
3   San Francisco, CA 94111
    Phone: (415) 277-7235
4   Fax: (415) 277-7238

5   NICHOLS KASTER, PLLP
6   E. Michelle Drake, MN Bar No. 0387366*
    drake@nka.com
7   Megan D. Yelle, MN Bar No. 0390870*
    myelle@nka.com
8   4600 IDS Center
    80 South 8th Street
9   Minneapolis, MN 55402
10  Phone: (612) 256-3200
    Fax: (612) 338-4878

11
    GOTTLIEB & ASSOCIATES
12  Jeffrey M. Gottlieb, NY Bar No. JG-7905*
    nyjg@aol.com
13  Dana L. Gottlieb, NY Bar No. DG-6151*
    danalgottlieb@aol.com
14  150 East 18th Street, Suite PHR
15  New York, NY 10003
    Phone: (212) 228-9795
16  Fax: (212) 982-6284
17  *pro hac vice applications forthcoming

18  Attorneys for Individual and Representative Plaintiffs

19          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
            **IN AND FOR THE COUNTY OF SAN FRANCISCO**
20

21  ERIC     HALVORSON,     LAURA          Case No.:
    FERRER,    PETER    DALLMAN,            **CGC 15 548270**
22  ROBERT     GRANA,    DENNIS
    BULCAO,   and   NEIL   YOUNG,           **CLASS ACTION COMPLAINT**
23  individually, as representatives of the **FOR DAMAGES**
    classes, and on behalf of the general
24  public                                  (I) – (V) Violations of the Fair Credit
                                            Reporting Act, 15 U.S.C. § 1681, *et*
25          Plaintiffs,                     *seq.*; and
                                            (VI) – (X) Violations of the
26  v.                                      Investigative Consumer Reporting
                                            Agencies Act, Cal. Civ. Code § 1786 *et*
27  TALENTBIN, INC.,                        *seq.*

28          Defendant.                      **DEMAND FOR JURY TRIAL**

                        CLASS ACTION COMPLAINT

ENDORSED
F I L E D
San Francisco County Superior Court

OCT - 2 2015

CLERK OF THE COURT
BY:          RONNIE OTERO
                        Deputy Clerk

1    Plaintiffs Eric Halvorson, Laura Ferrer, Peter Dallman, Robert Grana, Dennis

2  Bulcao, and Neil Young (collectively "Plaintiffs"), by and through their attorneys, and on

3  behalf of themselves, the Putative Classes set forth below, and in the public interest, bring

4  the following class action claims against Defendant TalentBin, Inc. ("Defendant")

5  pursuant to the Fair Credit Reporting Act ("FCRA").  Plaintiffs also bring individual

6  claims against Defendant for violations of California's Investigative Consumer Reporting

7  Agencies Act ("ICRAA").

8                                **INTRODUCTION**

9    1.    This case is brought under the FCRA and the ICRAA against a consumer

10  reporting agency who routinely improperly furnishes consumer reports to third parties for

11  monetary gain.

12    2.    Specifically, Defendant operates a website that scours the internet and

13  aggregates personal information about consumers from various sources.  Defendant then

14  assembles that information into a "candidate profile" which includes a ranking of the

15  consumer's skills based on the information Defendant has gathered about them.  Once

16  Defendant has compiled this information into a candidate profile, it then sells the

17  information to its customers to use in order to evaluate candidates for employment

18  purposes.

19    3.    Notably, most consumers do not sign up to have their information featured

20  on Defendant's website.  While consumers who choose to do so can submit information

21  for inclusion in their profile, Defendant's regular business practice is to create profiles on

22  consumers and sell them, without the consumer having done *anything* to invite or initiate

23  a relationship with Defendant.  No Plaintiff in this case ever signed up for Defendant's

24  site or did anything to participate in Defendant's creation of their profiles.

25    4.    Because Defendant, for monetary gain, sells these candidate profiles to

26  employers who utilize its services, Defendant is a consumer reporting agency as that term

27  is defined in the FCRA.  *See* 15 U.S.C. § 1681a(f).  For these same reasons, Defendant is

28

CLASS ACTION COMPLAINT

1  an "investigative consumer reporting agency" as that term is defined in the ICRAA. *See*

2  Cal. Civ. Code § 1786.2(d).

3       5.    Defendant claims that the information it gathers about consumers is "[a]

4  full picture of a candidate's professional and personal interests, aggregated and scored

5  from their entire social footprint."  https://www.talentbin.com/features#find (last accessed

6  September 10, 2015) (attached as Exhibit 1).

7       6.    Defendant sells this information for monetary fees, in the form of monthly

8  subscriptions paid by its employer customers.  https://www.talentbin.com/pricing (last

9  accessed September 10, 2015) (attached as Exhibit 2).

10       7.    Defendant's entire marketing strategy is aimed at encouraging its

11  customers to use its reports for employment purposes. *See*

12  http://hiring.monster.com/recruitment/talentbin.aspx (last accessed September 15, 2015)

13  (Exhibit 3) ("[TalentBin] can help you find, engage with, and recruit hard-to-find

14  technical talent");  https://pando.com/2013/07/16/talentbin-raises-2-million-series-a-to-

15  help-use-data-to-discover-hidden-technical-talent/ (last accessed September 15, 2015)

16  (Exhibit 4) ("TalentBin aims to offer employers a comprehensive perspective on a

17  potential candidate's qualifications, interests, and abilities.  Specifically, this data is all

18  available publicly, but typically goes far beyond that which a user will typically include

19  on their linkedin profile and resume. The company's algorithms then analyze this data and

20  help recruiters surface otherwise hard-to-find technical talent. 'Consumers create implicit

21  professional data across the Web, for example in the names and descriptions of GitHub

22  repositories that they own and patents that they file,' TalentBin co-founder Peter Kazanjy

23  says. 'We simply take this info that is naturally created in the process of doing one's job

24  and make it 'recruiting useful.'"");

25  http://www.vcpost.com/articles/21884/20140224/monster-gobbles-up-us-recruiting-

26  startups-talentbin-and-gozaik.htm#ixzz3lBM9C3ND (last accessed September 15, 2015)

27  (Exhibit 5) ("According to TalentBin, it is a 'talent search engine' that collects

28  information about potential employees from social networking sites such as Facebook,

CLASS ACTION COMPLAINT

1   Twitter, and Quora.  It also provides tools that employers can use to communicate to their

2   chosen candidates.")

3       8.     Because the "full picture" Defendant sells is both "assembled by" and

4   "evaluated by" Defendant, and because Defendant sells the information for use for

5   employment purposes, Defendant is a "consumer reporting agency" and the profile

6   Defendant creates is a "consumer report" within the meaning of the FCRA.  *See* 15 U.S.C.

7   §§ 1681a(d), (f).   For these same reasons, Defendant is an "investigative consumer

8   reporting agency" and the profile Defendant creates is an "investigative consumer report"

9   within the meaning of the ICRAA.  *See* Cal. Civ. Code §§ 1786.2(c), (d).

10      9.     Defendant gathers this information from many sources across the internet

11  rather than from the consumer themselves and without the consumers' authorization.

12  Accordingly, many of the consumers on whom Defendant has compiled a candidate

13  profile have no idea that such a profile exists or that it is being communicated to potential

14  employers.   In fact, Defendant's own co-founder, Pete Kazanjy, acknowledges that

15  gathering and assembling personal information on individuals without their knowledge or

16  consent is "creepy."  Vindu Goel, *Monster Moves to Restore a Faded Job Search Brand*,

17  N.Y. Times (Nov. 2, 2014, 7:00 AM),  bits.blogs.nytimes.com/2014/11/02/a-faded-

18  monster-seeks-a-return-to-glory/?_r=0 (Exhibit 6).

19      10.    Aside from being "creepy," when consumers are unaware of the

20  information being communicated about them, they are deprived of the opportunity to

21  ensure that the information is accurate, up-to-date, and adequately reflects their actual

22  qualifications.

23      11.    Defendant's practice of assembling candidate profiles and scoring

24  consumers' skills based on the information available on the internet without verifying the

25  accuracy and completeness of that information can significantly disadvantage jobseekers

26  for whom the aggregated information is inaccurate or outdated.  This is particularly true

27  where, as here, the consumer may not be aware of the profile and does not have an

28  opportunity to dispute any inaccuracies in the report.

-4-

12.     Recognizing that the content of consumer reports can have a significant impact on people's lives, Congress has chosen to regulate the procurement, use, and content of those reports through the FCRA.  15 U.S.C. § 1681, *et. seq.*

13.     One of the FCRA's cornerstone requirements is that consumer reporting agencies must have procedures in place to ensure that information included in consumer reports is maximally accurate and complete.  *See* 15 U.S.C. §§ 1681e(b), k.

14.     The ICRAA has a similar provision which requires investigative consumer reporting agencies to have procedures in place to "assure maximum possible accuracy" of the information contained in consumer reports.  Cal. Civ. Code § 1786.20(b).

15.     In recognition of the significant privacy interests when companies buy and sell information on private individuals, both the FCRA and the ICRAA restrict the scope of individuals to whom such information can be provided.  In the context of consumer reports provided for employment purposes, an employer must provide the consumer with a disclosure that the report will be procured for employment purposes, and the consumer must affirmatively consent, in writing, to such reports being provided.  *See* 15 U.S.C. § 1681b(b)(2); Cal. Civ. Code §§ 1786.16(a)(2)(B), (C)

16.     Both the FCRA and the ICRAA put the onus on consumer reporting agencies to ensure that only authorized individuals have access to consumer reports which are prepared for employment purposes.  Specifically, the FCRA requires that, prior to providing a prospective user with a consumer report, the consumer reporting agency must require the prospective user to "certify the purposes for which the information is sought, and certify that the information will be used for no other purpose."  15 U.S.C. § 1681e(a); *see also* Cal. Civ. Code § 1786.20(a).

17.     The FCRA further requires that, with respect to the prospective users who seek to use consumer reports for employment purposes, the consumer reporting agency must obtain a certification from the end user that the end user has provided the subject of the report with the required disclosure indicating a consumer report will be procured, and also that the end user has obtained the consumer's authorization to procure the report.

-5-

The consumer reporting agency must also obtain certification that the end user will provide adverse action notice to the consumer if the user intends to take adverse action based on the report. *See* 15 U.S.C. § 1681b(b)(1)(A). The ICRAA has adopted similar provisions requiring investigative consumer reporting agencies to obtain certification that the end user has provided the required disclosures to the consumer and that it will comply with the Act's adverse action provisions if adverse action is taken. *See* Cal. Civ. Code § 1786.12(e).

18. The requirements that the FCRA and the ICRAA impose on the agencies who provide consumer reports work together with the requirements imposed on users of consumer reports for employment purposes to ensure that only authorized individuals can access consumer reports, to ensure that consumers have knowledge that consumer reports about them are going to be used for employment purposes, that consumers have consented to such use, that consumers are informed if such reports operate to their detriment, and that consumers have an opportunity to obtain copies of their reports and to correct errors in the reports, if necessary.

19. As further discussed herein, Defendant has willfully violated the FCRA and the ICRAA and has failed to provide consumers with the protections Congress and the California legislature afforded to them.

20. The candidate profiles assembled by Defendant operate as precisely the kind of secret evaluative communication between a third party and a potential employer that can work to the detriment of the consumer, but of which the consumer has no knowledge.

21. Defendant does not obtain certifications from its end users that they are obtaining consumer consent and providing consumers with required disclosures prior to obtaining candidate profiles. Nor does Defendant ensure that consumers are informed when their candidate profiles impact their employment prospects.

22. By failing to obtain certifications and to provide disclosures, Defendant has willfully and systematically violated the FCRA in the following ways: (1) by failing to

-6-

provide its employer-users with notice of their obligation to comply with the applicable provisions of the FCRA in violation of 15 U.S.C. § 1681b(b)(1)(B); (2) by failing to obtain the necessary certifications from its employer-users attesting that they will comply with these provisions and applicable federal and state equal employment opportunity laws and regulations in violation of 15 U.S.C. § 1681b(b)(1)(A); (3) by failing to provide a summary of the consumer's rights under the FCRA with the consumer report in violation of 15 U.S.C. § 1681b(1)(B); and (4) by failing to provide consumers with a copy of their full consumer files upon request in violation of 15 U.S.C. § 1681g.

23.   Likewise, Defendant has systematically violated the ICRAA in the following ways: (1) by failing to obtain the necessary certifications from its employer-users attesting that they will comply with the relevant provisions of the ICRAA in violation of Cal. Civ. Code §§ 1786.12(e), 1786.20(a); (2) by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports to persons with a permissible purpose in violation of Cal. Civ. Code § 1786.20(a); (3) by failing to conspicuously post on its website the required information regarding its privacy practices in violation of Cal. Civ. Code § 1786.20(d)(1)(A); (4) by failing to provide the required notices on the first page of an investigative consumer report in violation of Cal. Civ. Code § 1786.29; and (5) by failing to provide consumers with a copy of reports provided to third parties about them upon the consumers' requests in violation of Cal. Civ. Code § 1786.11.

24.   As Defendant's illegal business practices are routine and systematic, Plaintiffs assert claims on behalf of themselves and the proposed Classes for statutory and punitive damages, as well as equitable relief.

## THE PARTIES

25.   Plaintiff Eric Halvorson is an individual person and a resident of Chicago, Illinois.

26.   Plaintiff Laura Ferrer is an individual person and a resident of San Jose, California.

CLASS ACTION COMPLAINT

1      27.    Plaintiff Peter Dallman is an individual person and a resident of Irvine,

2   California.

3      28.    Plaintiff Robert Grana is an individual person and a resident of South Gate,

4   California.

5      29.    Plaintiff Dennis Bulcao is an individual person and a resident of San

6   Ramon, California.

7      30.    Plaintiff Neil Young is an individual person and a resident of San Pedro,

8   California.

9      31.    Defendant TalentBin, Inc. is a California corporation headquartered in San

10   Mateo, California.

## JURISDICTION AND VENUE

32.    This Court has jurisdiction over Plaintiffs' claims based on concurrent jurisdiction under 15 U.S.C. § 1681p and Cal. Civ. Code § 410.10.

33.    Venue is proper in the County of San Mateo because a substantial part of the events giving rise to this claim occurred in this County, and Defendant is headquartered in this County.

## STATUTORY BACKGROUND

34.    Congress enacted the FCRA in 1970 to ensure fair and accurate credit reporting and to protect consumer privacy by requiring consumer reporting agencies and users of consumer reports to "adopt reasonable procedures for meeting the needs of commerce" in a manner which is "fair and equitable to the consumer," and "with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681.

35.    Under the FCRA, a "consumer report" is:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of servicing as a factor in establishing the consumer's eligibility for – (B) employment purposes.

-8-

CLASS ACTION COMPLAINT

15 U.S.C. § 1681a(d).

36.    Under the FCRA, a "consumer reporting agency" is:

> any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).

37.    The FCRA imposes obligations on both users of consumer reports (such as a prospective employer) and the consumer reporting agencies that provide consumer reports to the end users.

38.    In order to inform users of consumer reports about their obligations, a consumer reporting agency must provide any party "to whom a consumer report is provided by the agency" with "a notice of such person's responsibilities" under the FCRA. 15 U.S.C. § 1681e(d)(1).

39.    Additionally, prior to providing a user with a consumer report, a consumer reporting agency must obtain a certification from the user stating that the consumer report will only be used for a "permissible purpose" as that term is defined in the FCRA. 15 U.S.C. §§ 1681b(f)(2), e(a).

40.    The FCRA prohibits users from obtaining consumer reports unless the user has a permissible purpose for procuring the report, as defined in the statute. Specifically, 15 U.S.C. § 1681b(f) provides:

> A person shall not use or obtain a consumer report for any purpose unless (1) the consumer report is obtained for a purpose which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

41.    To ensure that consumer reports are being obtained for only permissible purposes, the FCRA requires that before a consumer reporting agency furnishes a report to a user, the consumer reporting agency must make "a reasonable effort to verify the

-9-

1  identity of a new prospective user and the uses certified by such prospective user prior to

2  furnishing such user a consumer report." 15 U.S.C. § 1681e(a).

3      42.    One permissible purpose for obtaining a consumer report is "employment

4  purposes," but consumer reports used for employment purposes are subject to further

5  certification requirements under the FCRA.

6      43.    In addition to certifying that a consumer report is being sought for a

7  "permissible purpose," a party using a consumer report for employment purposes must

8  also certify to the consumer reporting agency that the user has complied with the

9  disclosure obligations set forth in 15 U.S.C. § 1681b(b)(2)-(3)[1], will not use the

10  information in the consumer report "in violation of any applicable Federal or State equal

11  employment opportunity law or regulation" and, if necessary, will comply with the

12  adverse action notice provision of 15 U.S.C. § 1681b(b)(3).[2] 15 U.S.C. § 1681b(b)(1)(A).

13      44.    The FCRA requires a consumer reporting agency providing reports for

14  employment purposes to provide a document setting forth a summary of the consumer's

15  rights under the FCRA prior to or contemporaneously to the provision of the consumer

16  report. *See* 15 U.S.C. § 1681b(b)(1)(B).

17      45.    Finally, consumer reporting agencies are required to provide consumers

18  about whom they have provided a consumer report to a third party with a copy of the

19  consumer's "full file" upon request. *See* 15 U.S.C. § 1681g.

20  _____

21  [1] The disclosure obligations in 15 U.S.C. § 1681b(b)(2) require that a party requesting a
consumer report for employment purposes must disclose, in a stand-alone document

22  consisting solely of the disclosure, that it intends to obtain a consumer report for the
purpose and must also obtain the written consent of the subject of the consumer report to

23  obtain the report. 15 U.S.C. § 1681b(b)(2)(A)(i)-(ii). 15 U.S.C. § 1681b(b)(3) requires
that, if a party using a consumer report for employment purposes intends to take adverse

24  action, in whole or in part, based on the content of the report, the user must provide notice
to the consumer before taking adverse action, and also provide the consumer with a copy

25  of the report.

26  [2] The adverse action provision, 15 U.S.C. § 1681b(b)(3), requires that a user of a
consumer report provide the consumer with notice, including information on how to

27  request a copy of the consumer report, prior to taking adverse action (such as the denial of
an employment opportunity) based on that report and again after adverse action is taken.

28

1    46.    Failure to comply with these provisions constitutes a violation of the

2    FCRA and subjects the consumer reporting agency to civil liability for "any actual

3    damages sustained by the consumer as a result of the failure or damages of not less than

4    $100 and not more than $1,000" for each violation, plus punitive damages and attorneys'

5    fees as determined by the court. 15 U.S.C. § 1681n(a).

6    47.    In 1975, the California legislature recognized that consumer reporting

7    agencies need to "exercise their grave responsibilities with fairness, impartiality, and a

8    respect for the consumer's right to privacy." Cal. Civ. Code § 1786(b).

9    48.    Under the ICRAA, an investigative consumer report is "a consumer report

10   in which information on a consumer's character, general reputation, personal

11   characteristics, or mode of living is obtained through any means...." Cal. Civ. Code §

12   1786.2(c).

13   49.    Under the ICRAA, an investigative consumer reporting agency is "any

14   person who, for monetary fees or dues, engages in whole or in part in the practice of

15   collecting, assembling, evaluating, compiling, reporting, transmitting, transferring, or

16   communicating information concerning consumers for the purposes of furnishing

17   investigative consumer reports to third parties...." Cal. Civ. Code § 1786.2(d).

18   50.    Defendant has violated various provisions of the ICRAA aimed at

19   protecting consumers' right to privacy.

20   51.    The ICRAA requires investigative consumer reporting agencies to

21   "maintain reasonable procedures designed to... limit the furnishing of investigative

22   consumer reports for the purposes" allowed under the statute.   Cal. Civ. Code §

23   1786.20(a). While "employment purposes" is one of the enumerated permissible purposes

24   under the ICRAA, the Act specifically requires that an investigative consumer reporting

25   agency "shall require that prospective users of the information identify themselves, certify

26   the purposes for which the information is sought and that the information will be used for

27   no other purposes." *Id.*

28

CLASS ACTION COMPLAINT

52.     Furthermore, under the ICRAA, an investigative consumer reporting agency "shall not prepare or furnish an investigative consumer report to a person" for employment purposes unless the agency has received a certification that the person has: (1) made the required disclosures to the consumer, including disclosing that a consumer report will be obtained, the permissible purpose of the report and that the report may include information on the consumer's character, general reputation, personal characteristics, and mode of living; (2) complies with the Act's provisions regarding adverse action; and (3) provides the consumer with "a means by which the consumer may indicate on a written form, by means of a box to check, that the consumer wishes to receive a copy of any report that is prepared."     Cal. Civ. Code §§ 1786.12(e), 1786.16(a)(2)(B), (a)(4), (b).

53.     The ICRAA also requires investigative consumer reporting agencies to "conspicuously post... on its primary Internet Web site information describing its privacy practices with respect to its preparation and processing of investigative consumer reports." The privacy practices information is required to include, among other things, "[a] statement entitled 'Personal Information Disclosure: United States or Overseas,' that indicates whether the personal information will be transferred to third parties outside the United States or its territories." Cal. Civ. Code § 1786.20.  Defendant's privacy policy contains no such statement and is in violation of the Act.   Your Privacy Rights, http://inside.monster.com/fullpolicy/inside2.aspx (last accessed September 10, 2015) (Exhibit 7).

54.     Investigative consumer reporting agencies must also include certain required notices on the first page of an investigative consumer report. Cal. Civ. Code § 1786.29. The Act requires that an investigative consumer reporting agency include on the first page of the report, among other things: (1) "A notice in at least 12-point boldface type setting forth that the report does not guarantee the accuracy of truthfulness of the information as to the subject of the investigation...", and (2) "a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to

-12-

1  receive all disclosures...." *Id.* Finally, the ICRAA requires that an investigative

2  consumer reporting agency provide a consumer who requests it with a copy of any

3  investigative consumer report that the agency has provided to any third parties within the

4  last two years. *See* Cal. Civ. Code § 1786.11.

5       55.    Failure to comply with these provisions constitutes a violation of the

6  ICRAA and subjects the investigative consumer reporting agency to civil liability to the

7  consumer who is the subject of the report for any actual damages suffered by the

8  consumer or the sum of $10,000 (whichever is greater), plus attorneys' fees and costs.

9                     **ALLEGATIONS RELATING TO PLAINTIFF HALVORSON**

10       56.    In or around February 2015, Plaintiff Halvorson became aware that his

11  personal information had been compiled into a candidate profile on Defendant's website.

12       57.    Prior to that date, Halvorson was unaware that his personal information

13  was viewable by potential employers on Defendant's website.

14       58.    Halvorson never signed up with Defendant, and he never gave his consent

15  for Defendant to create, sell, or otherwise assemble or evaluate any information about

16  him.

17       59.    Defendant did not obtain any certifications regarding the purpose for the

18  report or compliance with the FCRA's disclosure and authorization requirements or the

19  ICRAA's disclosure requirements from the prospective employers to whom it disclosed

20  Halvorson's candidate profile. Nor did it provide those users with any summary of rights

21  under the FCRA.

22       60.    On February 23, 2015, Halvorson requested a copy of the candidate profile

23  that Defendant had compiled regarding him using Defendant's online request form.

24  Exhibit 8.

25       61.    On or about February 26, 2015, Defendant provided Halvorson with a copy

26  of his candidate profile. Exhibit 9. Defendant did not provide Halvorson with any

27  information regarding the third parties to whom Halvorson's consumer report was

28  provided or the source of the information contained on the report.

-13-

62.     The candidate profile Defendant had created about Halvorson reflected inaccurate and out-of-date information including listing his current job as "Production Supervisor" at "Media Services, Gustavus Adolphus College" and failing to reflect Halvorson's degree from Gustavus Adolphus College.  Exhibit 9.

63.     Seeking an identification of the sources of the information contained in his candidate profile and the third parties to whom his profile was communicated, on September 18, 2015, Halvorson sent Defendant a written request for his consumer file under 15 U.S.C. § 1681g.  Exhibit 10.

## ALLEGATIONS RELATING TO PLAINTIFF FERRER

64.     In or around April 2015, Plaintiff Ferrer became aware that her personal information had been compiled into a candidate profile on Defendant's website.

65.     Prior to that date, Ferrer was unaware that her personal information was viewable by potential employers on Defendant's website.

66.     Ferrer never signed up with Defendant, and she never gave her consent for Defendant to create, sell, or otherwise assemble or evaluate any information about her.

67.     Defendant did not obtain any certifications regarding the purpose for the report or compliance with the FCRA's disclosure and authorization requirements or the ICRAA's disclosure requirements from the prospective employers to whom it disclosed Ferrer's candidate profile.  Nor did it provide those users with any summary of rights under the FCRA.

68.     On or about April 8, 2015, Ferrer requested a copy of the candidate profile that Defendant had compiled regarding her using Defendant's online request form.  Exhibit 11.

69.     On or about April 9, 2015, Defendant provided Ferrer with a copy of her candidate profile.  Exhibit 12.  Defendant did not provide Ferrer with any information regarding the third parties to whom Ferrer's consumer report was provided or the source of the information contained on the report.

-14-

70.     The candidate profile Defendant had created about Ferrer reflected inaccurate and out-of-date information including listing inaccurate dates and job titles for many of the positions held by Ferrer.  The profile also failed to include Ferrer's bachelor's degree.

71.     Seeking an identification of the sources of the information contained in her candidate profile and the third parties to whom her profile was communicated, on August 14, 2015, Ferrer sent Defendant a written request for her consumer file under 15 U.S.C. § 1681g.  Exhibit 13.

72.     On August 25, 2015, Plaintiff Ferrer's counsel received a response from Monster Worldwide, Inc., identified as the parent company of Defendant, stating that they would not be responding to Ferrer's request stating:

> TalentBin is not a consumer reporting agency nor does it furnish consumer reports as defined by the FCRA, *see* 15 U.S.C. §1861a [sic].  Further, any attempt to use our services  as such would be a violation of TalentBin's and Monster's Terms of Use (http://inside.monster.com/terms-of-use), which state clearly, '**You may not use the Monster Content or Profiles to determine a consumer's eligibility for: (a) credit or insurance for personal, family, or household purposes; (b) employment; or (c) a government license or benefit.**'

*See* Exhibit 14 (emphasis in original).

## ALLEGATIONS RELATING TO PLAINTIFF DALLMAN

73.     In or around April 2015, Plaintiff Dallman became aware that his personal information had been compiled into a candidate profile on Defendant's website.

74.     Prior to that date, Dallman was unaware that his personal information was viewable by potential employers on Defendant's website.

75.     Dallman never signed up with Defendant, and he never gave his consent for Defendant to create, sell, or otherwise assemble or evaluate any information about him.

76.     Defendant did not obtain any certifications regarding the purpose for the report or compliance with the FCRA's disclosure and authorization requirements or the

-15-
CLASS ACTION COMPLAINT

ICRAA's disclosure requirements from the prospective employers to whom it disclosed Dallman's candidate profile. Nor did it provide those users with any summary of rights under the FCRA.

77. On or about April 8, 2015, Dallman requested a copy of the candidate profile that Defendant had compiled regarding him using Defendant's online request form.

78. Defendant never provided Dallman with a copy of the candidate profile that it had compiled on him.

79. Seeking a copy of his profile as well as an identification of the sources of the information contained in his candidate profile and the third parties to whom his profile was communicated, on August 14, 2015, Dallman sent Defendant a written request for his consumer file under 15 U.S.C. § 1681g. Exhibit 15.

80. On September 10, 2015, Plaintiff Dallman's counsel received a response from Monster Worldwide, Inc., identified as the parent company of Defendant, stating that they would not be responding to Dallman's request stating:

> TalentBin is not a consumer reporting agency nor does it furnish consumer reports as defined by the FCRA, *see* 15 U.S.C. §1861a [sic]. Further, any attempt to use our services as such would be a violation of TalentBin's and Monster's Terms of Use (http://inside.monster.com/terms-of-use), which state clearly, '**You may not use the Monster Content or Profiles to determine a consumer's eligibility for: (a) credit or insurance for personal, family, or household purposes; (b) employment; or (c) a government license or benefit.**'

*See* Exhibit 16 (emphasis in original).

## ALLEGATIONS RELATING TO PLAINTIFF GRANA

81. In or around May 2015, Plaintiff Grana became aware that his personal information had been compiled into a candidate profile on Defendant's website.

82. Prior to that date, Grana was unaware that his personal information was viewable by potential employers on Defendant's website.

-16-

CLASS ACTION COMPLAINT

83.   Grana never signed up with Defendant, and he never gave his consent for Defendant to create, sell, or otherwise assemble or evaluate any information about him.

84.   Defendant did not obtain any certifications regarding the purpose for the report or compliance with the FCRA's disclosure and authorization requirements or the ICRAA's disclosure requirements from the prospective employers to whom it disclosed Grana's candidate profile.   Nor did it provide those users with any summary of rights under the FCRA.

85.   On or about May 6, 2015, Grana requested a copy of the candidate profile that Defendant had compiled regarding him using Defendant's online request form. Exhibit 17.

86.   On or about May 11, 2015, Defendant provided Grana with a copy of the candidate profile that it had compiled on him.   Exhibit 18.   Defendant did not provide Grana with any information regarding the third parties to whom Grana's consumer report was provided or the source of the information contained on the report.

87.   The candidate profile Defendant had created about Grana reflected inaccurate and out-of-date information including listing his current job as "Employee" at "Parker Hannifin" when Grana was no longer employed by that company.

88.   Seeking an identification of the sources of the information contained in his candidate profile and the third parties to whom his profile was communicated, on September 18, 2015, Grana sent Defendant a written request for his consumer file under 15 U.S.C. § 1681g.   Exhibit 19.

## ALLEGATIONS RELATING TO PLAINTIFF BULCAO

89.   In or around May 2015, Plaintiff Bulcao became aware that his personal information had been compiled into a candidate profile on Defendant's website.

90.   Prior to that date, Bulcao was unaware that his personal information was viewable by potential employers on Defendant's website.

-17-

91.     Bulcao never signed up with Defendant, and he never gave his consent for Defendant to create, sell, or otherwise assemble or evaluate any information about him.

92.     Defendant did not obtain any certifications regarding the purpose for the report or compliance with the FCRA's disclosure and authorization requirements or the ICRAA's disclosure requirements from the prospective employers to whom it disclosed Bulcao's candidate profile.  Nor did it provide those users with any summary of rights under the FCRA.

93.     On or about May 6, 2015, Bulcao requested a copy of the candidate profile that Defendant had compiled regarding him using Defendant's online request form. Exhibit 20.

94.     On or about May 11, 2015, Defendant provided Bulcao with a copy of the candidate profile that it had compiled on him.  Exhibit 21.  Defendant did not provide Bulcao with any information regarding the third parties to whom Bulcao's consumer report was provided or the source of the information contained on the report.

95.     The candidate profile Defendant had created about Bulcao reflected inaccurate and out-of-date information, including listing his current jobs as "Sr. Technical Writer" at "Google," "Employee" at "Q Model Management," "Employee" at "Unidentified Company," "Employee" at "Lexmark International," and "Employee" at "Bailey Gardiner" when Bulcao was no longer employed by those companies and has never been employed by a company called "Q Model Management."  The profile also listed Bulcao as having "28 years" of experience when in reality he has about 12 years of experience.

96.     Seeking an identification of the sources of the information contained in his candidate profile and the third parties to whom his profile was communicated, on September 18, 2015, Bulcao sent Defendant a written request for his consumer file under 15 U.S.C. § 1681g.  Exhibit 22.

-18-

## ALLEGATIONS RELATING TO PLAINTIFF YOUNG

97.     In or around March 2015, Plaintiff Young became aware that his personal information had been compiled into a candidate profile on Defendant's website.

98.     Prior to that date, Young was unaware that his personal information was viewable by potential employers on Defendant's website.

99.     Young never signed up with Defendant, and he never gave his consent for Defendant to create, sell, or otherwise assemble or evaluate any information about him.

100.    Defendant did not obtain any certifications regarding the purpose for the report or compliance with the FCRA's disclosure and authorization requirements or the ICRAA's disclosure requirements from the prospective employers to whom it disclosed Young's candidate profile.  Nor did it provide those users with any summary of rights under the FCRA.

101.    On or about March 31, 2015, Young requested a copy of the candidate profile that Defendant had compiled regarding him using Defendant's online request form. Exhibit 23.

102.    On or about April 9, 2015, Defendant purported to provide Young with a copy of the candidate profile that it had compiled on him.  Exhibit 24.  However, the profile that was provided to Young contained no information despite the fact that information about Young is viewable when his profile is accessed on the Defendant's website.  Furthermore, Defendant did not provide Young with any information regarding the third parties to whom Young's consumer report was provided or the source of the information contained on the report.

103.    Seeking a full copy of his profile as well as an identification of the sources of the information contained in his candidate profile and the third parties to whom his profile was communicated, on August 14, 2015, Young sent Defendant a written request for his consumer file under 15 U.S.C. § 1681g.  Exhibit 25.

-19-

104.    On August 25, 2015, Young's counsel received a response from Monster Worldwide, Inc., identified as the parent company of Defendant, stating that they would not be responding to Young's request stating:

> TalentBin is not a consumer reporting agency nor does it furnish consumer reports as defined by the FCRA, *see* 15 U.S.C. §1861a [sic].  Further, any attempt to use our services  as such would be a violation of TalentBin's and Monster's Terms of Use (http://inside.monster.com/terms-of-use), which state clearly, '**You may not use the Monster Content or Profiles to determine a consumer's eligibility for: (a) credit or insurance for personal, family, or household purposes; (b) employment; or (c) a government license or benefit.**'

*See* Exhibit 14 (emphasis in original).

## DEFENDANT'S ILLEGAL BUSINESS PRACTICES

105.    Defendant operates an online repository of personal information on thousands of individuals that it sells to prospective employers who are seeking job candidates.

106.    Defendant's customers are employers who pay a fee to search through and view the candidate profiles available on Defendant's website. https://www.talentbin.com/pricing (last accessed September 10, 2015) (Exhibit 2).

107.    Defendant's website, www.talentbin.com, is an online tool that is targeted at corporate recruiters and advertises itself as a tool to "find unfindable... talent." Defendant does this by providing profiles of consumers, or "candidates" in Defendant's parlance.  These candidate profiles consist of information aggregated and compiled from across the internet about the particular consumer, including information gathered from social media sources such as Twitter, Facebook, Quora, Google+, Meetup, Blogger and many others.

108.    This information can include photographs of the consumer, job history, education, professional interests, personal interests, and summaries of the consumer's activity on various social media sites.

-20-

109.   In addition to aggregating and compiling this personal information, Defendant scores the skills of consumers based on the information it has gathered.   At various times during this score has been reflected in different ways in the candidate profile including as a number (on a scale from 1 to 100) encased in a flame graphic that indicates how "hot" a candidate is with respect to a particular skill or interest and as a "star rating" (on a scale from 1 to 5 stars).

110.   Because the information compiled on a candidate profile is gathered from various sources on the internet and is not authorized or verified by the consumer themselves, there is no guarantee that the candidate profile is accurate, up-to-date, or presents a clear picture of the candidate's qualifications.

111.   In fact, in many instances, the consumer about whom Defendant has created a candidate profile is not aware of the existence of the profile or that the information therein is being communicated to potential employers.

112.   A consumer cannot simply go to Defendant's website and view the profile that Defendant has created about them.   A consumer's full profile is only available to the consumer after requesting their profile on Defendant's website.   In order to request a copy of their profile, a consumer must click on a link on Defendant's website which says "Remove your profile" and fill out a request form.

113.   While a consumer can request that Defendant remove the profile about them, Defendant does not guarantee that a consumer's profile will remain removed from the website.   https://www.talentbin.com/profileinquiry (last accessed September 10, 2015) (Exhibit 26) ("We can only remove web identities currently on the TalentBin site (they are all we know right now!).   If new identities are discovered and added to the site in the future, you will need to submit another request").

114.   The candidate profiles assembled by Defendant are communications to third parties of information that bear on a consumer's "character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the

-21-

consumer's eligibility for…" employment. Thus, the candidate profiles meet the statutory definition of a "consumer report" (*see* 15 U.S.C. § 1681a(d)) and an "investigative consumer report" (Cal. Civ. Code § 1786.2(c)). *See also, Ernst v. DISH Network, LLC*, 49 F. Supp. 3d 377 (S.D.N.Y. 2014) (holding that a communication consisting solely of the label "high risk" met the statutory definition of a "consumer report"); *Trans Union Corp. v. F.T.C.*, 245 F.3d 809, 813 (D.C. Cir. 2001) (stating that meeting the FCRA definition of a consumer report "does not seem very demanding" as "almost any information about a consumer arguably bears on their personal characteristics or mode of living"); *Hoke v. Retail Credit Corp.*, 521 F.2d 1079, 1081 (4th Cir. 1975) (finding "character" and "mode of living" to be "virtually limitless").

115. Because Defendant regularly assembles consumer information by aggregating consumers' personal information from across various sources, compiles that information into candidate profiles, evaluates that information, and communicates the profiles to third parties in exchange for monetary fees, it is a "consumer reporting agency" as that term is defined in the FCRA (15 U.S.C. § 1681a(f)) and an "investigative consumer reporting agency" as that term is defined in the ICRAA (Cal. Civ. Code § 1786.2(d)).

116. In a May 9, 2011 letter, the Federal Trade Commission ("FTC") analyzed the issue of whether Social Intelligence Corporation ("Social Intelligence") was a consumer reporting agency under the FCRA. *Letter from Mithal, FTC to Renee Jackson*, 2011 WL 2110608 (May 9, 2011). Social Intelligence, like Defendant, sold reports that "include[d] public information gathered from social networking sites." *Id.* The FTC determined that Social Intelligence was a consumer reporting agency "because it assembles or evaluates consumer report information that is furnished to third parties that use such information as a factor in establishing a consumer's eligibility for employment." *Id.* Based on this determination, the FTC stated that Social Intelligence "must take reasonable steps to ensure the maximum possible accuracy of the information reported from social networking sites" and "must also provide employers who use their consumer

-22-

reports with information about their obligations under the FCRA, such as their obligation to provide employees or applicants with notice of any adverse action taken on the basis of these reports." *Id.*

117.    As a consumer reporting agency, Defendant has certain obligations under the FCRA, including the obligation to notify each user of the candidate profiles of its responsibilities under the FCRA.  15 U.S.C. § 1681e(d)(1).

118.    Defendant does not provide its users with a notice of the users' responsibilities under the FCRA despite the clear statutory mandate set forth in 15 U.S.C. § 1681e(d)(1):

> **(1)    Notice requirement.** – A consumer reporting agency shall provide to any person –
>
> (A)    who regularly and in the ordinary course of business furnishes information to the agency with respect to any consumer; or
>
> (B)    to whom a consumer report is provided by the agency;
>
> A notice of such person's responsibilities under this subchapter.

15 U.S.C. § 1681e(d)(1).

119.    Defendant also has an obligation under the FCRA to obtain a certification from each of its customers that has access to the candidate profiles certifying that: (1) the information in the consumer report is being sought for a permissible purpose; (2) that the employer-user provided a disclosure to the consumer on whom the report is being sought; (3) that the employer-user obtained the consumer's authorization prior to obtaining the consumer report; (4) that the employer-user will, if necessary, comply with the FCRA's adverse action provisions set forth in 15 U.S.C. § 1681b(b)(3); and (5) that "information from the consumer report will not be used in violation of any applicable Federal or State equal employment opportunity law or regulation." *See* 15 U.S.C. §§ 1681e(a), b(b)(1)(A).

120.    Defendant has a parallel obligation under the ICRAA to obtain a certification from each of its customers certifying that: (1) the customer has made the statutorily required disclosures to the consumer prior to obtaining the report; (2) the

-23-

customer will provide the consumer a means by which the consumer can elect to receive a copy of the report that is prepared; (3) the customer will comply with the ICRAA's adverse action provisions, if applicable; and (4) the purpose for which the report is being sought is a permissible purpose under the ICRAA.  Cal. Civ. Code §§ 1786.12(e), 1786.16(4), (5)(b), 1786.20(a).

121.    Defendant does not obtain the required certifications from its employer-users or attempt to verify that the users were seeking the information for a permissible purpose prior to providing those users with consumer reports on job applicants.

122.    Defendant's standard practice of failing to obtain these certifications is contrary to the plain text of 15 U.S.C. § 1681b(b)(1)(A) (and the analogous ICRAA provisions) which states:

> A consumer reporting agency may furnish a consumer report for employment purposes only if—
>
> > (A) the person who obtains such report from the agency certifies to the agency that –
> >
> > > (i) the person has complied with paragraph (2) with respect to the consumer report, and the person will comply with paragraph (3) with respect to the consumer report if paragraph (3) becomes applicable; and
> > >
> > > (ii) information from the consumer report will not be used in violation of any applicable Federal or State equal-employment opportunity law or regulation; and

and to the plain text of 15 U.S.C. § 1681e(a) (emphasis added) which requires that:

> Every consumer reporting agency shall maintain reasonable procedures designed to avoid violations of section 1681c of this title and to limit the furnishing of consumer reports to the purposes listed under section 1681b of this title.  These procedures shall require that prospective users of the information identify themselves, **certify the purposes for which the information is sought, and certify that the information will be used for no other purpose.  Every consumer reporting agency shall make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report.**

*See also*, Cal. Civ. Code §§ 1786.12(e), 1786.20(a).

-24-

123.   Defendant also does not provide its users with a summary of the consumer's rights under the FCRA prior to or contemporaneously to the provision of the consumer report.

124.   Defendant's standard practice of failing to provide this summary is in direct contradiction to the plain text of 15 U.S.C. § 1681b(b)(1)(B) which states:

> A consumer reporting agency may furnish a consumer report for employment purposes only if -- ... (B) the consumer reporting agency provides with the report, or has previously provided, a summary of the consumer's rights under this subchapter....

125.   Likewise, Defendant does not provide consumers with the required notice of its privacy practices (Cal. Civ. Code § 1786.20(d)(1)(A)) nor does Defendant provide the required notices on the first page of the investigative consumer report (Cal. Civ. Code § 1786.29).  Defendant failed to provide these notices despite a clear statutory mandate requiring that these notices be provided.

126.   Defendant has also violated both the FCRA and the ICRAA by failing to provide consumers with a copy of their full files upon request.  Under the FCRA, a consumer reporting agency is required to provide a consumer with their full files including an identification of the third parties to whom it provided a copy of the report and an identification of the sources from which it obtained the information that is contained on the report.  15 U.S.C. § 1681g.  Defendant consistently and systematically fails to provide consumers with this information upon request in violation of 15 U.S.C. § 1681g.

127.   The ICRAA also requires that an investigative consumer reporting agency provide consumers with a copy of the reports that it provided to any third parties within the last two years upon the consumers' requests.  *See* Cal. Civ. Code § 1786.11. Defendant consistently and systematically fails to provide consumers with a copy of their investigative consumer report upon request in violation of Cal. Civ. Code § 1786.11.

-25-

128.   Defendant acted knowingly and willfully in violating the clear statutory mandates set forth in the FCRA, 15 U.S.C. §§ 1681b(b)(1), e(a), e(d)(1), g.  Defendant's knowing and willful conduct is reflected by, among other things:

    a.   Defendant was aware of the FCRA and its applicability to employment screening;

    b.   Defendant's self-serving letters to some Plaintiffs in response to Plaintiffs' § 1681g requests for disclosures from their files evidence Defendant's ongoing awareness of the risk that it might be deemed a consumer reporting agency;

    c.   Defendant's transparent efforts to use fine print in its terms and conditions to forbid its customers from using its reports for employment purposes was reckless in the extreme—Defendant's entire purpose in collecting and publishing the information it published on its website was to encourage users to use the information for employment purposes.  Defendant's marketing materials are replete with references to using the information it collected and published for the purpose of making employment decisions.  *See ¶ 7, supra;*

    d.   Defendant was aware of the applicability of the FCRA to its actions.  An article titled "Social Media Recruiting: Understand the Legal Guidelines" on the "Recruiting and Hiring Advice" webpage of Defendant's corporate parent, Monster.com, specifically addresses this issue stating that "One of the easiest ways to use social media is for recruiting to review an applicant's own public postings and accounts, providing a better picture of him or her as a potential employment" but cautioning employers that "[i]f you use an outside company to perform the [social media] background check, you must adhere to the requirements of the 'Fair Credit Reporting Act.'"   http://hiring.monster.com/hr/hr-best-practices/recruiting-hiring-

1     advice/acquiring-job-candidates/social-media-recruiting-guidelines.aspx

2     (last accessed September 15, 2015) (Exhibit 27);

3     e.  Similarly an article titled Recruitment Strategies: Virtual Recruitment

4     Tools and Tactics available on Monster.com states "be aware that some

5     virtual recruiting tools may implicate the Fair Credit Reporting Act.  If an

6     employer uses an outside company to pre-screen applicants, the vendor

7     may be considered a 'consumer reporting agency', in which case both

8     vendor and employer are required to meet a number of legal requirements

9     which       include      having     candidates      sign      a      release."

10    http://hiring.monster.com/hr/hr-best-practices/recruiting-hiring-

11    advice/acquiring-job-candidates/virtual-recruitment-strategies.aspx   (last

12    accessed September 15, 2015) (Exhibit 28);

13    f.  Several other articles regarding the FCRA are also available on

14    Monster.com's "Recruiting and Hiring Advice" webpage including, "The

15    Ins      and      Outs      of      Hiring      a      Consumer      Reporting      Agency,"

16    (http://hiring.monster.com/hr/hr-best-practices/recruiting-hiring-

17    advice/job-screening-techniques/consumer-reporting-agencies.aspx)

18    (Exhibit 29); "New 2013 Forms for Employee Background Checks"

19    (http://hiring.monster.com/hr/hr-best-practices/small-

20    business/news/employee-background-checks.aspx) (Exhibit 30); "Think

21    Before      You      Hire:      Maintaining      a      Legal      Hiring      Process"

22    (http://hiring.monster.com/hr/hr-best-practices/recruiting-hiring-

23    advice/acquiring-job-candidates/legal-hiring-process.aspx)   (Exhibit   31);

24    and "Small Business Employment Guide: Five Important Laws to Know"

25    (http://hiring.monster.com/hr/hr-best-practices/workforce-

26    management/employee-benefits-management/employment-laws.aspx)

27    (Exhibit 32) (all last accessed September 15, 2015);

28

-27-

CLASS ACTION COMPLAINT

g. Defendant's parent company, Monster Worldwide, runs background checks on its own employees;

h. Despite the fact that Defendant was aware of the FCRA's applicability to employment screening, Defendant made no effort to comply with the FCRA's requirements;

i. Defendant knew that its candidate profiles constitute "consumer reports" as that term is defined in the FCRA;

j. Defendant knew that in providing its customers with candidate profiles regarding particular consumers it was acting as a "consumer reporting agency" as that term is defined in the FCRA;

k. Defendant knew that, as a consumer reporting agency, it was required to comply with the FCRA's requirements, including, *inter alia*, obtaining the required certifications from users of consumer reports and providing the required disclosures to consumers and users of consumer reports;

l. Defendant did not, in fact, comply with these requirements;

m. Defendant knew that its failure to comply with these requirements was in violation of multiple provisions of the FCRA;

n. Despite the pellucid statutory text and there being a depth of guidance, Defendant systematically furnished consumer reports without first obtaining valid certifications from the users of the reports; and

o. By adopting such a policy, Defendant knowingly violated the law and voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

## CLASS ACTION ALLEGATIONS

129. Plaintiffs assert their claims under the FCRA on behalf of the proposed Classes defined as follows:

**Improper Procedures Class**: All individuals about whom Defendant created a "candidate profile" and communicated that "candidate profile" to

-28-

a third-party in the two years predating the filing of this Complaint and continuing through the date the class list is prepared.

**Inadequate Disclosures Subclass**:    All members of the Improper Procedures Class who requested information from their consumer files from Defendant and to whom Defendant did not provide information from the individual's file in the two years predating the filing of this Complaint and continuing through the date the class list is prepared.

130.    This action is brought, and may properly be maintained, as a class action under Cal. Civ. Code § 382 because there is a well-defined community of interest in the litigation, and the proposed Classes are easily ascertainable from Defendant's records.

131.    Numerosity:    The Classes are so numerous that joinder of all class members is impracticable.    Defendant has communicated profiles on over 1,000 class members, and many of those individuals have requested information from Defendant.

132.    Typicality: Plaintiffs' claims are typical of the class members' claims.  The FCRA violations committed by Defendant were committed pursuant to uniform policies and procedures, and Defendant treated Plaintiffs in the same manner as other class members in accordance with its standard policies and practices.

133.    Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Classes, and have retained counsel experienced in complex class action litigation.

134.    Commonality:  Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes, including without limitation:

    a.    Whether Defendant's candidate profiles are consumer reports as that term is defined in the FCRA;

    b.    Whether Defendant is a consumer reporting agency as that term is defined in the FCRA;

    c.    Whether Defendant failed to provide notice to its users of their responsibilities under the FCRA in violation of 15 U.S.C. § 1681e(d)(1);

    d.    Whether Defendant failed to obtain certification of a permissible purpose from its users in violation of 15 U.S.C. § 1681e(a);

-29-

e.   Whether Defendant failed to "make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report" in violation of 15 U.S.C. § 1681e(a);

f.   Whether Defendant failed to obtain certification from its users certifying that they would comply with 15 U.S.C. § 1681b(b)(2), § 1681b(b)(3), and applicable federal and state equal employment opportunity laws and regulations in violation of 15 U.S.C. § 1681b(b)(1);

g.   Whether Defendant failed to provide its users with a summary of the consumer's rights under the FCRA prior to or contemporaneous to the provision of a consumer report in violation of 15 U.S.C. § 1681b(b)(1)(B);

h.   Whether Defendant failed to provide consumers with a their full consumer files upon request in violation of 15 U.S.C. § 1681g;

i.   Whether Defendant's conduct was willful under the FCRA;

j.   The appropriateness and proper measure of statutory damages; and

k.   The appropriate scope of injunctive relief.

135.   Class certification is appropriate under Cal. Civ. Code § 382 because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the FCRA. Members of the Classes do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendant by any members of the Classes on an individual basis. Class certification will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a

-30-

class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

### CLAIMS FOR RELIEF
### COUNT I: 15 U.S.C. § 1681e(a)
### Failure to Obtain Certification of a Permissible Purpose
(On behalf of Plaintiffs and the members of the Improper Procedures Class)

136.    It is Defendant's policy and practice not to obtain 15 U.S.C. § 1681e(a) certifications from its users certifying that the procurement of consumer reports are for a "permissible purpose" set forth in the FCRA or verifying the identity and purpose of a new user prior to providing those users with candidate profiles evaluating potential consumers' suitability for particular employment opportunities posted by those users.

137.    Defendant violated the FCRA by knowingly and willfully furnishing consumer reports on Plaintiffs and Improper Procedures Class members without first obtaining proper certifications from the users of those consumer reports that the users were obtaining the reports for a permissible purpose. *See supra*, ¶ 128

138.    Defendant further violated the FCRA by knowingly and willfully furnishing consumer reports on Plaintiffs and the Improper Procedures Class members without first making "a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report." 15 U.S.C. § 1681e(a). *See supra*, ¶ 128.

139.    Plaintiffs and the Improper Procedures Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, pursuant to 15 U.S.C. § 1681n(a)(1)(A). Plaintiffs and the Improper Procedures Class members are also entitled to punitive damages for these violations, pursuant to 15 U.S.C. § 1681n(a)(2). Plaintiffs and the Improper Procedures Class members are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3).

**COUNT II: 15 U.S.C. § 1681b(b)(1)(A)**
**Failure to Obtain Certification of Disclosure, Authorization, Adverse Action**
**Procedures and Equal Employment Opportunity Laws**
(On behalf of Plaintiffs and the members of the Improper Procedures Class)

140.    It is Defendant's policy and practice not to obtain 15 U.S.C. § 1681b(b)(1)(A) certifications regarding users' disclosure, authorization, adverse action procedures, and compliance with federal and state equal employment opportunity laws and regulations from its users prior to providing those users with candidate profiles evaluating consumers' suitability for particular employment opportunities posted by those users.

141.    Defendant violated the FCRA by knowingly and willfully furnishing consumer reports on Plaintiffs and Improper Procedures Class members without first obtaining a proper certification from the users of those consumer reports that the users would comply with 15 U.S.C. § 1681b(b)(2), § 1681b(b)(3), and federal and state equal employment opportunity laws and regulations. *See supra*, ¶ 128.

142.    Plaintiffs and the Improper Procedures Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, pursuant to 15 U.S.C. § 1681n(a)(1)(A).    Plaintiffs and the Improper Procedures Class members are also entitled to punitive damages for these violations, pursuant to 15 U.S.C. § 1681n(a)(2).    Plaintiffs and the Improper Procedures Class members are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3).

**COUNT III: 15 U.S.C. § 1681b(b)(1)(B)**
**Failure to Provide Summary of Consumer Rights**
(On behalf of Plaintiffs and the members of the Improper Procedures Class)

143.    It is Defendant's policy and practice not to provide the users of the consumer reports it provides for employment purposes with a summary of the consumers' rights under the FCRA prior to or contemporaneous to the provision of the candidate profiles evaluating potential consumers' suitability for employment opportunities with those users.

-32-

144. Defendant violated the FCRA by knowingly and willfully furnishing consumer reports on Plaintiffs and Improper Procedures Class members without providing the summary of the consumers' rights under the FCRA as required by 15 U.S.C. § 1681b(b)(1)(B). *See supra*, ¶ 128.

145. Plaintiffs and the Improper Procedures Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, pursuant to 15 U.S.C. § 1681n(a)(1)(A). Plaintiffs and the Improper Procedures Class members are also entitled to punitive damages for these violations, pursuant to 15 U.S.C. § 1681n(a)(2). Plaintiffs and the Improper Procedures Class members are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3).

### COUNT IV: 15 U.S.C. § 1681e(d)(1)
### Failure to Provide Notice to Users of FCRA Responsibilities
(On behalf of Plaintiffs and the members of the Improper Procedures Class)

146. It is Defendant's policy and practice not to provide notice to its users of the users' responsibilities under the FCRA.

147. Defendant violated the FCRA by knowingly and willfully failing to provide notice to its users of the users' responsibilities under the FCRA, as required by 15 U.S.C. § 1681e(d)(1). *See supra*, ¶ 128.

148. Plaintiffs and the Improper Procedures Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, pursuant to 15 U.S.C. § 1681n(a)(1)(A). Plaintiffs and the Improper Procedures Class members are also entitled to punitive damages for these violations, pursuant to 15 U.S.C. § 1681n(a)(2). Plaintiffs and the Improper Procedures Class members are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3).

-33-

**COUNT V: 15 U.S.C. §1681g**
**Failure to Provide Consumers' Full Files Upon Request**
(On behalf of Plaintiffs and the members of the Inadequate Disclosures Class)

149.    It is Defendant's policy and practice not to provide consumers with a copy of their full files, including an identification of the third parties to whom the consumers' information was provided and an identification of the sources of the information contained in the consumers' reports.

150.    Defendant violated the FCRA by knowingly and willfully failing to provide consumers with a copy of their full consumer files upon request.  15 U.S.C. § 1681g. *See supra,* ¶ 128.

151.    Plaintiffs and the Inadequate Disclosure Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, pursuant to 15 U.S.C. § 1681n(a)(1)(A).    Plaintiffs and the Inadequate Disclosure Class members are also entitled to punitive damages for these violations, pursuant to 15 U.S.C. § 1681n(a)(2).    Plaintiffs and the Inadequate Disclosure Class members are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3).

**COUNT VI: Cal. Civ. Code § 1786.12(e)**
**Failure to Obtain Certification of Disclosures, Option to Receive a Copy of the Report, and Adverse Action Procedures**
(On behalf of Plaintiffs individually)

152.    It is Defendant's policy and practice not to obtain Cal. Civ. Code § 1786.12(e) certifications regarding users' disclosures to consumers, compliance with the requirement to provide consumers with a means to obtain a copy of the report, and compliance with adverse action procedures from its users prior to providing those users with candidate profiles evaluating consumers' suitability for particular employment opportunities posted by those users.

153.    Defendant violated the ICRAA by furnishing investigative consumer reports on Plaintiffs without first obtaining a proper certification from the users of those

-34-

CLASS ACTION COMPLAINT

investigative consumer reports that the users would comply with Cal. Civ. Code §§ 1786.16(a)(4), (b). *See supra*, ¶ 127.

154.   Plaintiffs are entitled to statutory damages of $10,000 for each and every one of these violations, pursuant to Cal. Civ. Code § 1786.50(a)(1).  Plaintiffs are further entitled to recover their costs and attorneys' fees, pursuant to Cal. Civ. Code § 1786.50(a)(2).

**COUNT VII: Cal. Civ. Code § 1786.20(a)**
**Failure to Maintain Reasonable Procedures Designed to Limit the Furnishing of**
**Investigative Consumer Reports to Permissible Purposes**
(On behalf of Plaintiffs individually)

155.   It is Defendant's policy and practice not to obtain Cal. Civ. Code § 1786.20(a) certifications regarding users' permissible purpose to obtain the investigative consumer report from users prior to providing those users with candidate profiles evaluating consumers' suitability for particular employment opportunities posted by those users.

156.   Defendant violated the ICRAA by furnishing investigative consumer reports on Plaintiffs without first obtaining a proper certification from the users of those investigative consumer reports that the report was being procured for a permissible purpose as defined in Cal. Civ. Code § 1786.12.  This failure is in violation of Cal. Civ. Code § 1786.20(a) which requires investigative consumer reporting agencies to "maintain reasonable procedures designed to … limit furnishing of investigative consumer reports for the purposes listed under Section 1786.12."

157.   Plaintiffs are entitled to statutory damages of $10,000 for each and every one of these violations, pursuant to Cal. Civ. Code § 1786.50(a)(1).  Plaintiffs are further entitled to recover their costs and attorneys' fees, pursuant to Cal. Civ. Code § 1786.50(a)(2).

-35-

**COUNT VIII: Cal. Civ. Code § 1786.20(d)(1)(A)**
**Failure to Provide Notice of Defendants' Privacy Practices**
(On behalf of Plaintiffs individually)

158.　It is Defendant's policy and practice not to provide consumers with the privacy practices information required by Cal. Civ. Code § 1786.20(d)(1).

159.　Defendant violated the ICRAA by failing to include the required privacy practices information on its website including, but not limited to, the failure to include a statement entitled "Personal Information Disclosure: United States or Overseas" that informs a consumer whether the personal information gathered for use in an investigative consumer report will be transferred to third parties outside the United States. *See* Cal. Civ. Code § 1786.20(d)(1)(A).

160.　Plaintiffs are entitled to statutory damages of $10,000 for each and every one of these violations, pursuant to Cal. Civ. Code § 1786.50(a)(1). Plaintiffs are further entitled to recover their costs and attorneys' fees, pursuant to Cal. Civ. Code § 1786.50(a)(2).

**COUNT IX: Cal. Civ. Code § 1786.29**
**Failure to Provide Notices on Investigative Consumer Reports**
(On behalf of Plaintiffs individually)

161.　It is Defendant's policy and practice not to include notices on the first page of an investigative consumer report as required by Cal. Civ. Code § 1786.29.

162.　Defendant violated the ICRAA by failing to include the required notices on the first page of the investigative consumer reports it compiled and transmitted including: (1) a notice that the report "does not guarantee the accuracy of truthfulness of the information as to the subject of the investigation" and (2) a notice to the consumer setting forth the terms and conditions of his or her right to receive all disclosures as provided in Cal. Civ. Code § 1786.26.

163.　Plaintiffs are entitled to statutory damages of $10,000 for each and every one of these violations, pursuant to Cal. Civ. Code § 1786.50(a)(1). Plaintiffs are further entitled to recover their costs and attorneys' fees, pursuant to Cal. Civ. Code § 1786.50(a)(2).

-36-

## COUNT X: Cal. Civ. Code § 1786.11
### Failure to Provide Consumers with a Copy of Their Report Upon Request
(On behalf of Plaintiffs individually)

164.    It is Defendant's policy and practice not to provide consumers with a copy of the investigative consumer report(s) about that consumer that it provided to third parties within the last two years upon the request of the consumer.

165.    Defendant violated the ICRAA by failing to provide consumers with a copy of any reports provided to third parties within the last two years upon the request of the consumer as required by Cal. Civ. Code § 1786.12.

166.    Plaintiffs are entitled to statutory damages of $10,000 for each and every one of these violations, pursuant to Cal. Civ. Code § 1786.50(a)(1).  Plaintiffs are further entitled to recover their costs and attorneys' fees, pursuant to Cal. Civ. Code § 1786.50(a)(2).

## PRAYER FOR RELIEF

167.    WHEREFORE, Plaintiffs, on behalf of themselves and the Classes pray for relief as follows:

    a.  Determining that this action may proceed as a class action under Cal. Civ. Code § 382 as to the claims brought under the FCRA;

    b.  Designating Plaintiffs as Class Representatives and designating Plaintiffs' counsel as counsel for the Classes;

    c.  Issuing proper notice to the Classes at Defendant's expense;

    d.  Declaring that Defendant violated the FCRA;

    e.  Declaring that Defendant acted willfully, in knowing or reckless disregard of Plaintiffs' rights and its obligations under the FCRA;

    f.  Awarding statutory damages and punitive damages as provided by the FCRA;

    g.  Awarding reasonable attorneys' fees and costs as provided by the FCRA;

    h.  Declaring that Defendant violated the ICRAA;

1        i.  Awarding statutory damages to the Plaintiffs, individually, as provided

2           by the ICRAA;

3        j.  Awarding reasonable attorneys' fees and costs as provided by the

4           ICRAA;

5        k.  Awarding appropriate injunctive relief including an injunction

6           requiring that Defendant cease its unlawful practices and ensure that all

7           users of consumer reports furnished by Defendant certify that they have

8           a permissible purpose to use those reports;

9        l.  Granting other and further relief, in law or equity, as this Court may

10          deem appropriate and just.

11   **DEMAND FOR JURY TRIAL**

12       168.   Pursuant to Section 16, Article I of the California Constitution, and Cal.

13   Code Civ. Proc. § 631, Plaintiffs and the Classes demand a trial by jury.

15   Respectfully submitted,

16   Dated: **10/2/15**

            NICHOLS KASTER, LLP

17   By: _____

18          Matthew C. Helland

19   ATTORNEY FOR INDIVIDUAL AND
       REPRESENTATIVE PLAINTIFFS

-38-

1  NICHOLS KASTER, LLP
   Matthew C. Helland, CA Bar No. 250451
2  helland@nka.com
   One Embarcadero Center, Suite 720
3  San Francisco, CA 94111
   Phone: (415) 277-7235
4  Fax: (415) 277-7238

5  NICHOLS KASTER, PLLP
6  E. Michelle Drake, MN Bar No. 0387366*
   drake@nka.com
7  Megan D. Yelle, MN Bar No. 0390870*
   myelle@nka.com
8  4600 IDS Center
   80 South 8th Street
9  Minneapolis, MN 55402
10 Phone: (612) 256-3200
   Fax: (612) 338-4878

11
   GOTTLIEB & ASSOCIATES
12 Jeffrey M. Gottlieb, NY Bar No. JG-7905*
   nyjg@aol.com
13 Dana L. Gottlieb, NY Bar No. DG-6151*
14 danalgottlieb@aol.com
   150 East 18th Street, Suite PHR
15 New York, NY 10003
   Phone: (212) 228-9795
16 Fax: (212) 982-6284
17 *pro hac vice applications forthcoming

18 Attorneys for Individual and Representative Plaintiffs

19         SUPERIOR COURT OF THE STATE OF CALIFORNIA
            IN AND FOR THE COUNTY OF SAN FRANCISCO
20

21 | ERIC HALVORSON, LAURA | Case No.: |
| FERRER, PETER DALLMAN, | **CGC 15 548270** |
22 | ROBERT GRANA, DENNIS | |
| BULCAO, and NEIL YOUNG, | EXHIBIT INDEX TO CLASS ACTION |
23 | individually, as representatives of the | COMPLAINT |
| classes, and on behalf of the general | FOR DAMAGES |
24 | public | |
25 | Plaintiffs, | |
26 | v. | |
27 | TALENTBIN, INC., | |
28 | Defendant. | |

ENDORSED
F I L E D
San Francisco County Superior Court

OCT - 2 2015

CLERK OF THE COURT
BY: RONNIE OTERO
Deputy Clerk

1          **EXHIBITS**

2     EXHIBIT 1:   www.talentbin.com/features#find;

3     EXHIBIT 2:   www.talentbin.com/pricing;

4     EXHIBIT 3:   http://hiring.monster.com/recruitment/talentbin.aspx;

5     EXHIBIT 4:   "TalentBin raises $2 million Series A to help use data to discover

6     hidden technical talent," Pando.com July 16, 2013 Article;

7     EXHIBIT 5:   "Monster Worldwide gobbles up US recruiting startups Talentbin

8     and Gozaik," Venture Capital Post February 24, 2014 Article;

9     EXHIBIT 6:   "Monster Moves to Restore a Faded Job Search Brand," New York

10    Times November 2, 2014 Article;

11    EXHIBIT 7:   http://inside.monster.com/fullpolicy/inside2.aspx;

12    EXHIBIT 8:   Feb. 23, 2015 Email from TalentBin to Halvorson;

13    EXHIBIT 9:   TalentBin Profile for Halvorson;

14    EXHIBIT 10: Sept. 18, 2015 Request Letter to TalentBin on behalf of Halvorson;

15    EXHIBIT 11: April 9, 2015 Email from TalentBin to Ferrer;

16    EXHIBIT 12: TalentBin Profile for Ferrer;

17    EXHIBIT 13: Aug. 14, 2015 Request Letter to TalentBin on behalf of Ferrer;

18    EXHIBIT 14: Aug. 25, 2015 Letter from TalentBin re: Ferrer Request;

19    EXHIBIT 15: Aug. 14, 2015 Request Letter to TalentBin on behalf of Dallman;

20    EXHIBIT 16: Sept. 9, 2015 Letter from TalentBin re: Dallman Request;

21    EXHIBIT 17: May 11, 2015 Email from TalentBin to Grana;

22    EXHIBIT 18: TalentBin Profile for Grana;

23    EXHIBIT 19: Sept. 18, 2015 Request Letter to TalentBin on behalf of Grana;

24    EXHIBIT 20: May 11, 2015 Email from TalentBin to Bulcao;

25    EXHIBIT 21: TalentBin Profile for Bulcao;

26    EXHIBIT 22: Sept. 18, 2015 Request Letter to TalentBin on behalf of Bulcao;

27    EXHIBIT 23: April 1, 2015 Email from TalentBin to Young;

28    EXHIBIT 24: April 9, 2015 Email from TalentBin to Young;

-2-

EXHIBIT INDEX

1   EXHIBIT 25: Aug. 14, 2015 Request Letter to TalentBin on behalf of Young;

2   EXHIBIT 26: www.talentbin.com/profileinquiry;

3   EXHIBIT 27: "Social Media Recruiting: Understand the Legal Guidelines,"

4   Monster.Com HR-Best Practices Article;

5   EXHIBIT 28: "Recruitment Strategies: Virtual Recruitment Tools and Tactics,"

6   Monster.Com HR-Best Practices Article;

7   EXHIBIT 29: "The Ins and Outs of Hiring a Consumer Reporting Agency,"

8   Monster.Com HR-Best Practices Article;

9   EXHIBIT 30: "New   2013   Forms   for   Employee   Background   Checks,"

10   Monster.Com HR-Best Practices Article;

11   EXHIBIT 31: "Think Before You Hire: Maintain a Legal Hiring Process,"

12   Monster.Com HR-Best Practices Article;

13   EXHIBIT 32: "Small Business Employment Guide: Five Important Laws to

14   Know," Monster.Com HR-Best Practices Article.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

EXHIBIT INDEX

# Exhibit 1

# Find unfindable
## te **FIND** :alreal ENGAGE **MANAGE**    **COLLABORATE**    **SUCCESS**
**EVERYWHERE**

Find candidates where they live online based on their real interests and actions.



### Steven Patte.
**Software Engineer, Ob**
**Boston Area**

Referrals: **7 shared connections**

### *Resume Highlights*

**Pinterest** | **Facebook** | **Google** | **(9**

**ford University** | **Massachu**

**Similar Profiles**

Share Profile

---

🔍 ## The world's largest passive candidate database

Aggregated profiles from across 100+ websites help you find unfindable candidates.

⚙ ## Search like a boolean pro, without being one

The power of a boolean jet fighter bottled up into an easy-to-use interface, with visual boolean search, automated and custom query expansion rules, contact-channel search, and more.

📄 ## A deep dossier of each candidate, at your fingertips

A full picture of a candidate's
professional and personal interests,
aggregated and scored from their
entire social footprint. Awesome
information to start your
conversation with.

See how TalentBin
can help you find
unfindable technical
talent

| TRY FOR FREE (/REGISTER) | REQUEST DEMO (/REQUESTDEMO) |



# Engage in high impact conversations

Tools to make your candidate outreach better, faster, and more impactful.



## Outreach that lands in the inbox

Reach out to personal email addresses and social communication channels where candidates live their daily lives.



## Push your outreach into overdrive

Templated email outreach with a click of your mouse helps streamline your outreach workflow. Works with your own email, but also social communication channels like Twitter, Facebook, LinkedIn, and more.

## Targeted, personal communications

Take advantage of complete candidate data to write engaging outreach communications that maximize response rates.

 ## See who's on your wavelength

Email open tracking and link click tracking show you which candidates are engaging with your outreach.

Start creating high impact conversations with talent and hire

TRY FOR FREE (/REGISTER)

REQUEST DEMO (/REQUESTDEMO)

9/10/2015                                    Features • TalentBin



# Stay on top of your talent pipeline

Recruiters are busy people. Best in class organizational tools help you stay on top of your candidate pipeline with notes, stages, tasks, and reminders.



## Folders and pipelines keep you organized

Requisition folders help you keep track of your recruiting efforts by position. Pipelines help you visualize and work each part of your candidate funnel.

## All your candidate interaction, in one place

Track all candidate-facing activity in one place, with notes, communication history, and progression down the pipeline, right there on the candidate profile.



## Never miss a beat

Set tasks with reminders to make sure you and your team are following up with the right candidates at the right time.

Discover TalentBin's best in class tools and start hiring better

**TRY FOR FREE (/REGISTER)**

**REQUEST DEMO (/REQUESTDEMO)**



# Recruiting is a team sport

Seamlessly orchestrate activity between recruiters, sourcers, and hiring managers.

 No stepping on toes. Only kicking butt.

Separate user accounts help recruiters keep track of their own candidates, and not repeat colleague's work.

 Hiring managers can play too

Special "hiring manager" user accounts let hiring managers get involved earlier in the hiring process, to help Recruiting give candidates white glove experience.



## Visualize your team's progress

Individual and team reporting ensures everyone is moving the needle.

Get your whole team on board and start using TalentBin to hire

TRY FOR FREE (/REGISTER)

REQUEST DEMO (/REQUESTDEMO)

Features • TalentBin



# Everything you need for success

From rigorous implementation and onboarding assistance to best-in-class ongoing support, our customer success team is here to rocket you to success.

 ## We're here to help!

Phone and email support during business hours all week long. Our customer success team is here to answer your questions and set you up for success.

 ## Train with our recruiting experts

We'll get you up to speed in your first month with best practices to ensure your success.

 ## Ongoing training and guidance

We'll monitor your progress every month and share ideas to maximize your hiring efficiency.

Partner with our customer success team and see the results

**TRY FOR FREE (/REGISTER)**

**REQUEST DEMO (/REQUESTDEMO)**



# TalentBin everywhere you need it

With the most third-party integrations in the market, browser integration, and an extensible API, TalentBin can help you across your hiring workflow.

## TalentBin across the web

Take TalentBin with you across the web with our Chrome extension. Automatically see a candidate's entire social footprint in LinkedIn Recruiter, on Twitter, in your ATS, and more.



## Push TalentBin profiles to your ATS

Candidate ready to apply? Flip that TalentBin profile into your hiring system of record with a click of the mouse. Export to Jobvite, iCIMS, Avature, Bullhorn, COMPAS, SmartRecruiters, HireBridge, Jobs2Web, and Salesforce, or even CSV and PDF.

## Search TalentBin from inside your CRM or ATS

Want to search TalentBin profiles from within your existing system? No problem. Avature, COMPAS, Jobvite, and SmartRecruiters all allow TalentBin customers to access TalentBin search from right within their existing ATS.



## TalentBin Developer API

Ready to get geeky? Access TalentBin's data set via API for custom development with your own systems.

# Try TalentBin for Free Today

**TRY FOR FREE (/REGISTER)**

| FEATURES | RECOGNITION | RESOURCES | MORE | CONTACT | SOCIAL |
|---|---|---|---|---|---|
| Find (/features#find) | Press Accolades (/recognition) | Recruiting resources (/resources#technical-recruiting-resources) | Browser Plugin (https://chrome.google.com/webstore/detail/social-lookup-by-talentbi/ppomfpehkfdkngfloajgjllonjlnjdeh) | Request a demo (/requestademo) | (https://twitter |
| Engage (/features#engage) | Awards (/recognition) | Types of recruiting (/resources#different-types-of-recruiting) | Careers (/careers) | Remove your profile (/profileinquiry) | |
| Manage (/features#manage) | Testimonials (/recognition) | | | Support (http://support.talentbin.com) | |
| Collaborate (/features#collaborate) | Customers (/recognition) | | | (415) 361-5456 | |
| Success (/features#success) | | Video walkthroughs (/resources#video-walkthroughs) | | | |
| Everywhere (/features#everywhere) | | | | | |

© TALENTBIN INC 2015. ALL RIGHTS RESERVED.    Privacy (http://inside.monster.com/policy/inside2.aspx)    Terms (http://inside.monster.com/terms-of-use)

Czech (?lang=cs_cz) | Danish (?lang=da_dk) | Dutch (?lang=nl_nl) | English (?lang=en_us) | English (UK) (?lang=en_gb) | French (?lang=fr_fr) | German (?lang=de_de) | Italian (?lang=it_it) | Norwegian (?lang=no_no) | Polish (?lang=pl_pl) | Spanish (?lang=es_es) | Swedish (?lang=sv_se)

9/10/2015

Features • TalentBin

# Exhibit 2

9/10/2015

Pricing • TalentBin

# Plans and pricing



**12 MONTHS**

**$500**

/user/month* (billed annually)
United States pricing

$6,000

REQUEST DEMO (/REQUESTDEMO)

**ENTERPRISE**

**Site licensing**

**API Access**

**Custom integrations**

REQUEST DEMO (/REQUESTDEMO)

# Included in all plans

🔍 **World's largest candidate database**

300M+ candidate profiles from 100s of social, web and offline candidate sources.

📇 **Total candidate information**

A full picture of a candidate's professional and personal interests, aggregated and scored from their entire social footprint.

➤ **Efficient candidate outreach**

Templated email outreach to personal email addresses and social communication channels.

 **Best in class CRM tools**

Best in class organizational tools help you stay on top of your candidate pipeline with notes, stages, tasks, and reminders.

**Team collaboration**

Seamlessly orchestrate activity between recruiters, sourcers, and hiring managers.

 **Access everywhere**

The most third-party integrations in the market, browser integration, and an extensible API.

# Questions and answers

## How does the free trial work?

The free trial lets you search for candidates in the TalentBin database to see the power for yourself. If you decide you want full candidate information, you'll be asked to upgrade.

## Are there discounts available for multiple seats?

Yes! Please contact our sales team (mailto:subscriptions@talentbin.com) for more information.

## Can I get seats for the non-recruiters I collaborate with?

Yes! Please contact our sales team (mailto:subscriptions@talentbin.com) to discuss the options available for hiring manager seats and other collaborating team members.

## I have a totally different question!

No problem! Please contact our sales team (mailto:subscriptions@talentbin.com) or give us a
call at (415) 361-5456

\* All discounted products require a contract with an upfront payment

9/10/2015                                Pricing • TalentBin

# Try TalentBin for Free Today

**TRY FOR FREE (/REGISTER)**

| FEATURES | RECOGNITION | RESOURCES | MORE | CONTACT | SOCIAL |
|---|---|---|---|---|---|
| Find (/features#find) | Press Accolades (/recognition) | Recruiting resources (/resources#technical-recruiting-resources) | Browser PlugIn (https://chrome.google.com/webstore/detail/social-lookup-by-talentbi/ppomfpehkfkooajgjllonjlnjdeh) | Request a demo (/requestdemo) | |
| Engage (/features#engage) | Awards (/recognition) | | | Remove your profile (/profileinquiry) | (https://twitter |
| Manage (/features#manage) | Testimonials (/recognition) | Types of recruiting (/resources#different-types-of-recruiting) | Careers (/careers) | Support (http://support.talentbin.com) | |
| Collaborate (/features#collaborate) | Customers (/recognition) | | | (415) 361-5456 | |
| Success (/features#success) | | Video walkthroughs (/resources#video-walkthroughs) | | | |
| Everywhere (/features#everywhere) | | | | | |

© TALENTBIN INC 2015. ALL RIGHTS RESERVED.   Privacy (http://inside.monster.com/policy/inside2.aspx)   Terms (http://inside.monster.com/terms-of-use)

Czech (?lang=cs_cz) | Danish (?lang=da_dk) | Dutch (?lang=nl_nl) | English (?lang=en_us) | English (UK) (?lang=en_gb) | French (?lang=fr_fr) | German (?lang=de_de) | Italian (?lang=it_it) | Norwegian (?lang=no_no) | Polish (?lang=pl_pl) | Spanish (?lang=es_es) | Swedish (?lang=sv_se)

# Exhibit 3



# TalentBin by Monster

What if you could find, engage and recruit hard-to-find technical talent where they live online-with one solution?

Only TalentBin by Monster provides the largest database of skill-focused IT social profiles, gathered from the open web, with multiple messaging capabilities.

TalentBin by Monster is a technical talent search engine with over 100 million public, tech-focused profiles aggregated across 100+ websites that can help you find, engage with, and recruit hard-to-find technical talent.

**How TalentBin by Monster helps you find tech talent**     



TalentBin

 1-800-666-783 Start Sales Chat

# Find unfindable technical talent

Find candidates where they live online based on their real interests and actions.

### The ultimate passive candidate database
Aggregated profiles from across relevant websites help you find the otherwise unfindable candidates

### Search like a boolean pro, without being one
The power of a boolean jet fighter bottled up into an easy-to-use interface, with visual boolean search, automated and custom query expansion rules, contact-channel search, and more.

### A deep dossier of each candidate, at your fingertips
A full picture of a candidate's professional and personal interests, aggregated and scored from their entire social footprint. Awesome information to start your conversation with.

# Engage in high impact conversations

Tools to make your candidate outreach better, faster, and more impactful.

### Outreach that lands in the inbox
Reach out to personal email addresses and social communication channels where candidates live their daily lives. No email address? Our Email Concierge will hunt it down and deliver it to you.

### Push your outreach into overdrive
Templated email outreach with a click of your mouse helps streamline your outreach workflow. Works with your own email, but also social communication channels like Twitter, Facebook, LinkedIn, and more. Mass mailing and mail merging lets you fire off

dozens of targeted messages in short order.

**Targeted, personal communications**
Take advantage of complete candidate data to write engaging outreach communications that maximize response rates.

**See who's on your wavelength**
Email open tracking and link click tracking show you which candidates are engaging with your outreach.

# Stay on top of your talent pipeline

Recruiters are busy people. Automated, intelligent candidate relationship management tools help you stay on top of your candidate pipeline so you never miss an opportunity.

**Automatic, Intelligent CRM**
Spend less time clicking, and more time closing. Contact a candidate, and they move down the pipeline. They reply, Intelligent CRM tells you who's been opening and clicking your outreach, and is prime for follow up

**Automated follow-up keeps your pipeline warm**
Passive candidates often take two, three, or more messages before engaging - a necessary, but time intensive reality. TalentBin automates this for you. Tee up a first email, check a box, and TalentBin automatically sends a series of customizable follow-up emails over the coming weeks, raising your response rates, without the manual labor. When candidates respond, it pops to the top of your Dashboard.

**Folders and pipelines keep you organized**
Requisition folders help you keep track of your recruiting efforts by position. Pipelines help you visualize and work each part of your candidate funnel.

**All your candidate interaction, in one place**
Track all candidate-facing activity in one place, with notes, communication history, and progression down the pipeline, right there on the candidate profile.

**Never miss a beat**
Automated tasks and reminders make sure you and your team are following up with the right candidates at the right time.

# Recruiting is a team sport

Seamlessly orchestrate activity between recruiters, sourcers, and hiring managers.

### No stepping on toes
Separate user accounts help recruiters keep track of their own candidates, and not repeat colleague's work.

### Hiring managers can play too
Special "hiring manager" user accounts let hiring managers get involved earlier in the hiring process, to help Recruiting give candidates white glove experience.

### Visualize your team's progress
Individual and team reporting ensures everyone is moving the needle.

# Everything you need for success

From rigorous implementation and onboarding assistance to best-in-class ongoing support, our customer success team is here to rocket you to success.

### We're here to help!
Phone and email support during business hours all week long. Our customer success team is here to answer your questions and set you up for success.

### Train with our recruiting experts
We'll get you up to speed in your first month with best practices to ensure your success.

### Ongoing training and guidance
We'll monitor your progress every month and share ideas to maximize your hiring efficiency.

To Learn More About TalentBin by Monster Download the Product Sheet

Download Product Sheet (/LiteReg/TalentBin.aspx)

See how our customers have used TalentBin by Monster to recruit hard-to-find tech talent.

ARG Recruiting Group (http://media.newjobs.com/cms/static-
content/info/CUST/TalentBin_by_Monster_ARG_CSS.pdf)

FILD Staffing (http://media.newjobs.com/cms/static-
content/info/CUST/TalentBin_by_Monster_FILD_CSS.pdf )

iRise (http://media.newjobs.com/cms/static-content/info/CUST/TalentBin_by_Monster_iRise_CSS.pdf
)

Shapeways (http://media.newjobs.com/cms/static-
content/info/CUST/TalentBin_by_Monster_Shapeways_CSS.pdf)

---



ABOUT MONSTER (HTTP://WWW.MONSTER.COM/ABOUT) | WORK FOR MONSTER (HTTP://WWW.MONSTER.COM/ABOUT/WORK-FOR-US)
| PARTNER WITH US (HTTP://PARTNER.MONSTER.COM/) | USING MONSTER (HTTP://HIRING.MONSTER.COM/HR/HR-BEST-PRACTICES/MONSTER-
TRAINING.ASPX) | OCCUPATIONAL TRENDS (HTTP://HIRING.MONSTER.COM/HR/HR-BEST-PRACTICES/MARKET-INTELLIGENCE/OCCUPATIONAL-
REPORTS.ASPX)

INVESTOR RELATIONS (HTTP://IR.MONSTER.COM/PHOENIX.ZHTML?C=110723&P=IROL-IRHOME) | SOCIAL MEDIA (HTTP://CAREER-
SERVICES.MONSTER.COM/SOCIAL-MEDIA/HOME.ASPX) | TERMS OF USE (HTTP://INSIDE.MONSTER.COM/TERMS-OF-USE) | PRIVACY CENTER
(HTTP://INSIDE.MONSTER.COM/PRIVACY/HOME.ASPX) | HELP (HTTP://MONSTER-USEN.CUSTHELP.COM/APP/ANSWERS/LIST) | SECURITY
(HTTP://INSIDE.MONSTER.COM/SECURITY-CENTER/HOME.ASPX) | CONTACT US (HTTP://MONSTER-USEN.CUSTHELP.COM/APP/ASK) | SITE MAP
(HTTP://HIRING.MONSTER.COM/SITEMAP.ASPX)

Copyright © 2015 | MONSTER WORLDWIDE (HTTP://WWW.MONSTER.COM/)

FIND US ON GOOGLE+ (HTTPS://PLUS.GOOGLE.COM/+MONSTER)
U.S. Patents No. 7,599,930 B1; 7,827,125 and 7,836,060 - V: 2015.18.0.105.J2.8 - 304

# Exhibit 4

# A GOOD PROBLEM TO HAVE
## WHAT TO DO WHEN YOUR COMPANY OUTGROWS ITSELF
*A New Content Series from Pando*

PANDO series

Sponsored by
TriNet
Ambitions Realized®



Archive    Interviews    Join    Login    Search

# TalentBin raises $2 million Series A to help use data to discover hidden technical talent



9/15/2015                      Pando: TalentBin raises $2 million Series A to help use data to discover hidden technical talent

By Michael Carney
July 16, 2013

  

**NEWS**

Increasingly, top technology companies are recruiting in-house. Rather than relying on outside agencies, which spend inordinate amounts of time building talent databases, these companies must then source their own prospects. TalentBin, a startup which describes itself as a "talent search engine," has raised a $2 million Series A round of financing to offer a solution to this very problem.

The round was led by Lightbank, with participation from NEA, Foundation Capital, FundersClub, First Round Capital, and Charles River Ventures. Lightbank partner Paul Lee will join TalentBin's board.

TalentBin's core offering is a database consisting of more than 500 million social profiles aggregated from across "hundreds of sites," including major social platforms like Facebook, Twitter, Google+, Meetup, and Quora, as well as industry-specific communities such as Github, Stack Overflow, Behance, and others. The company also has included what it calls non-social sources such as the US Patent Database, open-source email list serves, and PubMed life sciences authorship database. The company currently adds approximately 10,000 new profiles each week to its database.

In this way, TalentBin aims to offer employers a comprehensive perspective on a potential candidate's qualifications, interests, and abilities. Specifically, this data is all available publicly, but typically goes far beyond that which a user will typically include on their linkedin profile and resume. The company's algorithms then analyze this data and help recruiters surface otherwise hard-to-find technical talent.

"Consumers create implicit professional data across the Web, for example in the names and descriptions of GitHub repositories that they own and patents that they file," TalentBin co-founder Peter Kazanjy says. "We simply take this info that is naturally created in the process of doing one's job and make it 'recruiting useful.'"

TalentBin users can access its database via a Web application, as a Google Chrome browser plug-in, or through an API connecting to existing Recruiting CRM, ATS, or HRIS systems. Clients pay $6,000 per year per recruiter for access to the system, a price point that is comparable to LinkedIn's rate of $8,000 per user and Monster.com's $7,000 per user. The company already works with more than 200 corporate clients including Facebook, Amazon, and UPS.

"What's appealing about TalentBin is that they have the vision to think beyond the

current state of the market to what it will be like years from now," Lightbank's Lee says.

Kazanjy adds, "Not only do we give a more holistic and 'human' snapshot of hard-to-find candidates, but we also provide the tools for communication, pipeline management and reporting -- all from one technology platform."

San Francisco-based TalentBin was named an "Awesome New Technology" at the 2012 HR Tech Conference, a "Recruiting Game Changer" at HR Tech Europe's iHR Awards, and a "Cool Vendor Supporting Multiple Nexus Forces" by Gartner. The company has raised "north of $4 million to date" including this latest round, according to Kazanjy, with previous financings consisting of a $1.2 million seed round and then another approximately $1 million from First Round Capital* and Charles River Ventures. The focus for the year ahead, according to Kazanjy, will be continuing to scale its sales organization, a challenge into which both Lightbank and NEA should be able to offer tremendous insight.

The company faces competition in the social talent search space from GitHub-focused Gild, which raised its own $8 million Series A round earlier this year, and from Entelo, which announced a $3.5 million Series A a month ago. Each of these three companies launched in 2011, but neither competitor has managed to aggregate the the volume of data sources that TalentBin has. To the extent that it's correct in its thesis that recruiter value such breadth, and that it can extract "professionally relevant data" from its wealth of sources, TalentBin appears to have the clear advantage. Other factors like user interface and pricing are more difficult to differentiate.

Says Kazanjy:

> *There is a major secular shift occurring in the market where organizations that bring recruiting in house need a talent marketplace to go shopping in. This has gone from being something that was initially hypothetically, conceptually interesting, to something that is now an enormous, and some would say even obvious market. But LinkedIn followed a similar trajectory. Not everyone recognized early on that it would one day be a huge recruiting platform.*

If Marc Andreessen is right in his infamous prediction that software is eating the world, then already scarce and valuable technical talent will only become an increasingly hot commodity. To that end, TalentBin and other companies that use data to help recruiters unlock hidden stores of such talent appear well positioned to capitalize on the next wave of innovation.

[Disclosure: First Round Capital is an investor in PandoDaily.]

   

# Read this next



### Startups Anonymous: Everything you need to know about being a non-technical founder

 Startups Anonymous

[This is a weekly series that brings you raw, first-hand experiences from founders and investors in the trenches. Their story submissions are anonymous, allowing them to share openly without fear of retribution. Every Wednesday, we'll run one new story chosen by Dana Severson, who operates StartupsAnonymous, a place for startups to share, ask questions, and answer them in story-length posts, all anonymously. You can share your own story here.]



### How Amazon is getting beat by an upstart alcohol delivery app in its own backyard

 Dennis Keohane

Amazon is obviously pushing the boundaries of how we purchase, receive, and consume retail goods and groceries these days. Recently, it unveiled its new physical Dash Button that customers can press to order refills on products such as diapers, laundry detergent, and coffee pods. Eventually, the company plans to use drones for same-day deliveries



### To promote app use, Jana offers users in emerging markets free data credits

 Dennis Keohane

It's no secret that one of the big reasons that Facebook paid more than $22 billion (a rough estimate based on the company's current stock price) for WhatsApp last year was the messaging application's enormous international presence. Fostering global user growth may also be part of the reason that Facebook launched the Internet.org initiative to bring more people online.

© Copyright 2015 PandoMedia Inc.

About / Disclosures    Contact Us    @pandodaily    Facebook

# Exhibit 5

9/15/2015                Monster Worldwide gobbles up US recruiting startups Talentbin and Gozaik regions : Venture Capital Post

♠ | SLIDESHOWS | ARCHIVE | VIDEOS | ABOUT | SPONSOR | CONTRIBUTOR | CONTACT          WEATHER  NEW YORK, NY  ☀  +65°F

# VENTURE CAPITAL POST

SEP 15, 2015 UPDATED 09:03 AM EDT  .  MAKE VCPOST YOUR HOMEPAGE

**DEALS    INVESTORS    FUNDING    REGIONS    SECTORS    PEOPLE    REGULATORY    LIFE**          Search

CHINA    FACEBOOK    EUROPE    GDP    INDIA    APPLE

## REGIONS

BACK TO HOMEPAGE
SUBSCRIBE TO RSS FEED

Breaking News       Macquarie Group's expected profits to surge 40% in H...

## Monster Worldwide gobbles up US recruiting startups Talentbin and Gozaik



(Credit: Monster) This image file contains the company logo of New York, US-based on firm Monster Worldwide.



**10 ways to transform your business with data ...**
When data is brought to life, insight is immediate. Business int...
Sponsored by Microsoft

**February 24** 9:31 PM 2014          by VCPOST Staff Reporter          🖶 Print This Article
                                      💬0 Comments          ≺ Share It With Friends

Monster Worldwide annouced today that it has purchased two startups TalentBin and Gozaik, which both allow employers to recruit workers via social networks, according to TechCrunch. The financial terms of the acquisition were not disclosed in the said report.



# Want to work on cutting edge technology?

The aproximate date of the aquisition were within the first quarter this year. More details will be released at an investor breifing on May 14.

Monster Chief Executive Officer (CEO) Sal Iannuzzi said in his acquisition announcement: "The acquisition of TalentBin and Gozaik completes one key component of a larger strategy designed to help our business grow."

According to TalentBin, it is a "talent search engine" that collects information about potential employees from social networking sites such as Facebook, Twitter, and

MOST POPULAR                    MORE ARTICLES



**S&P Downgrades Brazil's Credit Rating Straight Down to Junk Territory**

💬 0 Comments  ⤵ Read Full Article

**Matahari Mall launches in Indonesia, with $500M funding from Lippo Group, Aims to be "Alibaba of Indonesia"**

**Jeff Bezo's space firm joins Lockheed-Boeing rocket venture**

**Nestlé's Nespresso provides bigger cups of coffee for Americans**

**Zomato restaurant discovery acquired $60M funds; Introduces**

Quora. It also provides tools that employers can use to communicate to their chosen candidates. The startup raised a total of $3.2 million in funding from its investors, the report detailed.

Gozaik only annouces the aquisition from this deal and not much more. According to the report from TechCrunch referencing the release "the company allows employers to post targeted job ads on social networks."

## Sponsored From Around the Web


**10 Celebrities You Didn't Know Were Gay**


**7 Films With the Longest On-Screen Nudity**


**2 Veggies that "Destroy" Stomach Fat**


**How Older Women Are Losing Weight**


**Revealed: What's Kim's Big Secret?**


**Why Do Guys Like Back Dimples? Here Are 21 Reasons Why**


**63 Year Old Left for a Younger Woman, See Her Beauty Revenge**


**Controversial "Limitless Drug" Used by Rich People**


**35 Awkward Prom Photos that You'll Need to Look at Again**


**One Thing All Cheaters Have in Common, Site Reveals**

© 2015 VCPOST, All rights reserved. Do not reproduce without permission.

**Tags**  Monster Worldwide , TalentBin , Gozaik , TechCrunch , San Francisco , new york , Boston , US , Sal Iannuzzi , Facebook , Twitter , Quora

**Share**  f **SHARE** 0   **TWEET** 1   g+ **+1** 1   p **SHARE** 0   in **SHARE** 0

# COMMENTS

SCROLL BACK TO TOP

---

Whitelabel platform

Iran to sell crude oil to Asia on a huge discount in a bid to regain market share in the region

Two Giant Debt Collectors Ordered to Refund a Collected $61million to Consumers

BHS secures GBP 65M loan for a 2-year turnaround lifeline

Beauty products are the next big thing in Korean export

### SUBSCRIBE TO VCPOST NEWSLETTER

Sign up for our Deals of the Day newsletter.
We will not spam you!

**Name:**
Your Name

**E-mail:**
Your E-mail

[Subscribe]

### POPULAR TAGS

china  Facebook  Europe  Apple  GDP  India

Nike  Mark Zuckerberg  Iphone  Russia  ecommerce

online  Microsoft

### EDITOR'S PICK                    MORE ARTICLES

## Mark Zuckerberg to host Facebook Townhall Q&A with Indian Prime Minister Narendra Modi

Read Full Article

9/15/2015                    Monster Worldwide gobbles up US recruiting startups Talentbin and Gozaik acquisitions : Venture Capital Post

**0 Comments**   **VCPOST**                                    **1** Login ▾

♥ Recommend          ☞ Share                              Sort by Best ▾

👤   Start the discussion…

Be the first to comment.

ALSO ON VCPOST                                          WHAT'S THIS?

**Kmart brings back layaway program, launches No Money Down …**
1 comment • a day ago

> **Marie Firth** — Here is how you can° make 65 bucks /hr... After being unemployed for half-a-year , I …

**Is Blake Lively Throwing Shades at Taylor Swift? Ryan Reynolds Wife …**
1 comment • 3 days ago

> **avalon** — Stupid non story! Was she also dissing Karlie Koss, one of Swifts closest friends who was in the Bad …

**Andrew Garfield jealous over Emma Stone and Ryan Gosling? Former …**
1 comment • a day ago

> **Charissa** — Im starting to wonder if this just is some shit put out by the studio moles to drum up interest for …

**Oil Search Ltd rejects $8B takover offer by Woodside : Regions : …**
1 comment • 11 hours ago

> **Marie Firth** — Here is how you can make 65 bucks /hr... After being unemployed for half-a-year , I …

✉ Subscribe    ⓓ Add Disqus to your site    🔒 Privacy

**S&P Downgrades Brazil's Credit Rating Straight Down to Junk Territory**

⎘ Read Full Article

**Spotify Launches "Found Them First" Tool For Users' Bragging Rights Over Breakout Artists**

⎘ Read Full Article

Case 3:15-cv-05166-JCS　Document 1-1　Filed 11/10/15　Page 76 of 173

**Will Lenovo, HP and Dell consolidate in the PC market in the coming years?**

⏴ Read Full Article

**Breaking News**　　**Macquarie Group's expected profits to surge 40% in H1**

VCWHO DIRECTORY　　SLIDESHOWS　ARCHIVE　VIDEO　ABOUT　CONTACT US　PRIVACY POLICY　TERMS OF SERVICE

© 2015 Copyright Venture Capital Post. All Rights reserved.

Data by ✿VCWHO

# Exhibit 6

Case 3:15-cv-05166-JCS   Document 1-1   Filed 11/10/15   Page 78 of 173

# The New York Times

# Monster Moves to Restore a Faded Job Search Brand

**By Vindu Goel**  November 2, 2014 7:00 am

Remember Monster.com?

In the late 1990s, it capitalized on the rise of the web to put employment ads and workers' résumés into vast searchable databases online, effectively killing off print newspapers' Help Wanted sections. Pumped up by fast growth, witty Super Bowl ads and general dot-com mania, the stock of its parent company hit $92 a share in early 2000.

Then the disrupter was itself disrupted. Competing websites, as well as aggregators that scanned many sites for job listings and put them in one place, began to eat into Monster's business. LinkedIn was born and became a global behemoth by positioning itself as an upscale matchmaker that helped people build careers, not just find the next job.

Today, the company that owns Monster.com, renamed Monster Worldwide, is a shadow of its former self, and its stock trades for less than $4 a share. It still earns substantial revenue, $194.4 million in the second quarter of this year, from its job board and various other services. But now it wants to recapture some of its past luster by offering new cutting-edge tools for employers.

Its latest products, both rooted in start-ups acquired by Monster this year,

use big-data snooping and social-ad targeting to improve the process of matching job openings and potential applicants.

The more developed of the two new tools, called TalentBin, works by building profiles of individual workers. But unlike LinkedIn, it does so without their active participation or consent. Instead, TalentBin scans publicly posted information on social networks like Facebook, LinkedIn, Meetup and Twitter, as well as what people have put on industry-specific sites, such as GitHub for software engineers and Dribbble for visual designers, to craft the dossiers.

It then allows employers to run their job listings against the database to find people who meet certain criteria, such as "knows a lot about Java programming."

Recruiters can also study the dossiers to craft personalized email pitches to top candidates, citing personal or professional details from their profiles — something like "I loved the shoe designs you posted on Coroflot."

Creepy? Maybe a bit, acknowledged Pete Kazanjy, a vice president for product and technology at Monster and a co-founder of TalentBin. After all, most of the people receiving the job pitches do not know that these dossiers on them exist and probably are not even looking for a new job.

But he argued that people know they are being tracked by Facebook, Google, Yahoo and legions of unnamed data brokers. Receiving a thoughtful pitch about a new job that fits your talents and interests is a lot better than getting those generic emails and spam that recruiters so often send out. Someone might think, "You took the time to notice that I joined a Swift Meetup? I'm going to click on that," he said.

For employers, Mr. Kazanjy said, TalentBin addresses a persistent problem with LinkedIn: Individuals' profiles on that service are often outdated and incomplete, leading to bad search results for employers looking for candidates. (Two employers who use Monster's services, UPS and Facebook,

declined to discuss them, as did LinkedIn.)

For now, TalentBin is focused on tech and design workers, with health care coming next. So most of us have not yet been vacuumed into its files. (If you want to see any profile on you or to be deleted from the database, you can fill out a form on the website.)

The other new Monster tool, which will be rolled out for testing by employers this week, takes all the information that Monster has picked up about individuals — from TalentBin, Monster résumés, Twitter profiles and other sites it has scanned — and uses that to advertise specific jobs to them on Twitter.

Let's say UPS, one of the first testers, is looking for truck drivers in Pittsburgh. Monster's social-ads product will find everyone in its database who has mentioned a truck driving background and lives in that region, then send them an ad on Twitter about the UPS positions. Using Twitter's card technology, Monster can attach much more information about the job than can fit in a 140-character message.

"If a user clicks on that job, we can say with a high degree of certainty that they feel they are good for that job," said Joe Budzienski, a Monster vice president for product and technology and co-founder of Gozaik, the start-up that initially developed the technology. "We are trying to narrow it down so employers don't have to sift through résumés."

Mr. Budzienski sees the technology as particularly helpful for filling job categories with a lot of openings, such as temporary and customer service positions, in which the employer's challenge is to find enough qualified applicants. In addition to UPS, early testers will include Blue Shield of California, eBay, Geico, Manpower and Target.

In Monster's testing with its own job openings, he said, people who received the job ads on Twitter clicked on them as much as 8 percent of the

time — a much higher response rate than for the typical social ad. Of those who clicked, more than 10 percent went on to apply.

Monster is so confident its technique will work that it is charging a flat rate of $75 to $115 per job posting and will guarantee that employers get at least one respondent for every one.

Tammy Caldwell, director of talent acquisition at UPS, declined to discuss Monster in particular but said about 30 percent of the company's job applications came from social and mobile channels this year. "With social, we can get to a lot more people with a lot less spend," Ms. Caldwell said.

Just as Monster rode the web to greatness in its early days, it must figure out how to stay on top of the social wave now if it is going to endure.

"What we are looking to do is expand beyond the job posting to make recruiting more effective and efficient," said Mark Conway, Monster's chief information officer.

A version of this article appears in print on 11/03/2014, on page B6 of the NewYork edition with the headline: Monster Moves to Restore Its Job Search Brand.

© 2015 The New York Times Company

# Exhibit 7

9/10/2015                                          Monster Privacy Center | Monster.com

**Resumes     Jobs     Career Resources**                    Join Us  or  Sign In      Help & Security     Employers: Post Jobs & Find Talent

| Job title – e.g., accountant, sales | | Any Skills or Keywords | in | City, State, or Zip code | |

Advanced Search
Browse Jobs

## Full Privacy Policy

Privacy Center Home » Full Privacy Policy

Privacy Center Home

Privacy Policy

Your California Privacy Rights

Privacy FAQs

About Our Ads

FAQs About Our Ads

Private Resume Database Hosting

Cookie Info

Contact Us

**Additional Resources**

Accessibility Center

Security Center

Terms Of Use

**Need more help?**

**Need help signing in to your account or with general support questions?** Please contact us here.

For additional help, click here.

### Your Privacy Rights

Monster is committed to protecting the privacy of our users, and strives to provide a safe user experience. This Privacy Policy describes how we collect and use online data.

By using this site or application, you agree to the collection, use and transfer of your data as described in this Privacy Policy.

If you do not want your information to be collected, used, and transferred as described by this policy, you may revoke your consent to our Privacy Policy. To revoke your consent, please click here to contact us. If you revoke your consent, your account and profile information will be removed from our website.

Information collected on our sites and applications is stored in the United States; therefore, your information may become subject to U.S. law.

#### Scope of this Policy

This policy applies to information we collect or use on sites and applications owned or controlled by Monster Worldwide, Inc. or its affiliated companies ("Monster"). Affiliated companies are entities that control, are controlled by or are under common control with Monster Worldwide, Inc.

We link to other websites over which we have no control. Monster is not responsible for the privacy policies or practices of other websites. You may wish to review the privacy policies of those sites so you can understand how they collect, use, and share your information.

#### Information We Collect

We collect information about you when you use our sites and applications. We collect information directly from you such as your contact information, resume, and profile information. We receive and store this information when you enter it on our website, send it to us, or provide it to us in any other way.

For example, depending on the services you use, we collect:

- Credit card number and billing information (for services requiring payment)
- Information imported by you or your connections from third party applications
- Your race, ethnicity, or gender, if you choose to provide it

We also collect information about you automatically. We automatically collect information about how you use our sites and mobile applications, the areas of our site that you visit, as well as information about your computer or mobile device including your IP address, device ID, physical location, browser and operating system type, and referring URLs. This information is necessary for providing personalized and location-based content as well as for analyzing web traffic, troubleshooting problems, preventing fraud, and improving our services. We may combine this information with information in your account to help prevent fraud.

We may collect information about you from publicly-available websites. We may use this information to create a profile, even if you do not have an account with us, or append it to an existing profile. You will have the opportunity to claim collected information relating to you and to change its visibility setting or remove the information. However we cannot guarantee that we will not later collect from publicly-available websites other information that pertains to you.

We may receive a confirmation when you open an email from Monster if your computer supports this type of program.

If you choose to sign in with Facebook or similar sites, we import the requested information from your account and we make it part of your profile. Because Monster sites and applications are intended to allow you to share your information and to allow others to find you, we make certain information about you publicly available by default. Such information may, for example, be accessed by everyone on the Internet, including users without accounts, and may appear in public search engine search results. However, you can control the visibility of your information by managing your privacy settings. You can also restrict the information available to others by deleting information you do not want visible or by not providing it at all.

When you post information on another user's profile or comment on another user's post, the public availability of that information will be subject to the other user's privacy settings.

#### How We Use Information

We use the information we collect to provide our services, respond to you, operate and improve our sites and applications, and foster a positive user experience.

By registering with Monster, by managing your profile, by publicly posting information, or by opting in when presented with choices, you have consented

We self-certify compliance with:





for us to use your information in the following ways:

- to create a profile for you based on information that you have provided to us, information collected or imported from other sites or applications, or information provided to us by third parties such as your contacts or advertisers;
- to add information gathered from public websites to your profile;
- to provide personalized, targeted, or location-based content, services, and advertising from us and third parties;
- to allow you to contact other users or to invite others to join or create an account;
- to allow you to import information about yourself or your contacts from other sites or applications or to export your information to other sites or applications;
- to make purchases;
- to contact you about feature updates, informational and service-related communications, including important security updates;
- to provide you with additional communications, information, and promotions such as newsletters and career advice;
- to inform you of other products or services available from Monster or its affiliates;
- to enable you to contact us and for us to respond to you, to conduct surveys, promotions and contests, and to publish the results thereof;
- to help your friends, contacts, and potential employers find your profile and connect with you;
- to provide information about you and your potential interest in job postings to employer customers;
- to display targeted messages from employers based on the content of your resume or profile;
- to provide products and services to employer customers to complete the recruitment and hiring process;
- to provide products and services that enable users to network, post information on bulletin boards, view and compare profiles;
- to generate internal reports about the use of our sites and applications;
- to provide customers with reports about the characteristics and trends of the job market including availability of talent;
- to allow you to share jobs and profile information with your connections;
- to give search engines access to public information;
- to detect, investigate and prevent activities that may violate our policies or be illegal; and
- to make suggestions and draw inferences about you. For example, we may make suggestions about people you may know or additional jobs, products or services that might be of interest to you. Or, if you identify yourself as "Mrs." we will assume you are female.

Some of our products and services, such as our resume and profile database, social media search, and networking, enable third parties to see your personal information and to contact you. Profile information may be used for networking with other community members or may be visible to anyone using Monster sites and applications.

**Information you post in public areas of Monster sites or applications or make visible in the resume and profile database may be accessed, used, and stored by others around the world, including those in countries that might not have legislation that guarantees adequate protection of personal information as defined by your country of residence.** While Monster takes measures to safeguard your information from unauthorized access or inappropriate use, Monster does not control these third parties and we are not responsible for their use of information you give to us. Accordingly, you should not post sensitive information, personality profiles, or any other information you would not want made public, to any Monster site or application or to a public website.

Our services include the display of personalized products, content, and advertising relating to your career experience and interests online. We use data we have about you to determine whether you might be interested in the opportunities, products or services of a particular third party. We show you targeted ads online. These ads are targeted based on information we collect about you and information about you we acquire from third parties.

**How We Share Information**

We provide you with a platform to broadcast information about yourself to maximize your career opportunities. The information we gather may be shared within the Monster group of companies on a worldwide basis. **We do not share contact information with third parties for their direct marketing purposes unless you affirmatively agree to such disclosure.**

1. We share your information with third parties who help deliver our products and services to you. Examples include hosting our web servers, including resume database storage, analyzing data, providing marketing assistance, processing credit card payments, and providing customer service. These companies will have access to your personal information as necessary to perform their functions, but they may not use that data for any other purpose. We will remain responsible for any information shared in this way.

2. We may disclose information to third parties if you consent. For example:

(a) if you make your resume searchable or if we collect information you've made available on a public website then all parties with access to our resume or profile database products will have access to your information;

(b) if you opt in to receive information about the opportunities, products, or services of third parties, we supply your contact information to those third parties so they may contact you;

(c) if you previously chose to receive newsletters, commercial e-mails or other communications from Monster or third parties, but subsequently change your mind, you may opt out in those emails or by editing your account profile.

By applying to a job, providing your contact information to show interest in a job, or by replying to a message from an employer, you consent to the disclosure of your information to that employer.

We also share aggregated information (including location data) about Monster site visitors and application users with third parties to serve advertisements to you online. We may also aggregate data regarding job qualifications, schooling, age, experience level or other information relevant

9/10/2015                                    Monster Privacy Center | Monster.com 

to the job search. This aggregated data does not identify users individually, and may be made available to employers or fellow job seekers or community members. If we create a co-branded site with another company, information will be retained by both companies and subject to the privacy policies of both companies which will be published on the co-branded sites.

3. We may disclose to third parties information that we have collected from other websites.

4. We disclose information if legally required to do so, or at our discretion pursuant to a request from a governmental entity or if we believe in good faith – after considering your privacy interests and other factors – that such action is necessary to: (a) meet legal requirements or comply with legal process; (b) protect our rights or property or our affiliated companies; (c) prevent a crime or protect national security; or (d) protect the personal safety of users or the public.

5. We may disclose and transfer information to a third party who acquires any or all of Monster's business units, whether such acquisition is by way of merger, consolidation or purchase of all or a substantial portion of our assets. In addition, in the event Monster becomes the subject of an insolvency proceeding, such information will be disposed of in a transaction approved by the court. You will be notified of the sale of all or a substantial portion of our business to a third party by email or through a prominent notice posted on the site.

**An Important Note About Your Resume**

When you create or post a resume, we store it in our resume and profile database in the United States. You may control the status of your resume by setting it to visible, limited, or private. Visible and limited resumes can be viewed by anyone with access to our resume and profile database. We cannot control the retention, use or privacy of resumes that have been viewed or downloaded by others.

Private resumes will not be visible in our resume and profile database, but information we acquire about you from a public website may be visible. You may still use your private resume to apply online to a job. **If you do, your resume will be transferred to the relevant employer, who may retain a copy of your resume or distribute it to third parties.**

**We attempt to limit access to our resume and profile database to legitimate users, but cannot guarantee that other parties will not gain access to this database. We cannot control the use made of resumes by third parties who access the database.** Once your resume has been disclosed, Monster is not able to retrieve it from the third parties who accessed it.

You may remove your resume and profile from our database at any time. If you do not have an account with us, we may require you to provide us with information about yourself so we can locate your profile and delete it. However anyone who viewed your resume or profile may have kept a copy of it in their own files or databases. Accordingly, you should not put sensitive information, personality profiles, or other information you would not want made public, in your resume or profile.

If you provide us with details of a reference, it is your responsibility to ensure that the person is aware that you have forwarded his/her details and has consented in writing for you to do so.

Resumes or profiles you give to us must not contain sensitive data relating to your (i) racial or ethnic origin (ii) political beliefs (iii) philosophical or religious beliefs (iv) membership of a trade union or political party (v) physical or mental health or biometric details or genetic makeup (vi) addictions, sexual life (vii) the commission of criminal offences or proceedings and associated penalties or fines, (viii) the commission of any unlawful or objectionable conduct and associated penalties, or (ix) any Social Security Number or national identification number. If your resume or profile does contain this information, then you agree that it is at your own risk. We cannot control third parties' access to such information from our database.

**How We Store Information**

Because managing your career is a life-long process, we retain all the information we gather about you in an effort to make repeat use of our sites more efficient, practical and relevant until you change or remove your personal information as described below. You may access, review, correct, update, change or delete your resume or profile at any time. Sign in to your account, go to your resume or profile, and make the desired changes. If you do not have an account, please contact us.

Access to or correction, update, or deletion of your personal information may be denied or limited by Monster if it would violate another person's rights and/or as otherwise permitted by applicable law. If you wish to delete your account information altogether, please contact us. We will send you an email to confirm that your personal information has been deleted (save for an archival copy which is not accessible by you or third parties on the Internet). The archival copy is retained only for as long as needed for audit and record purposes. We will also keep logs and information that may relate to your activity on the site.

We will respond to information access requests without undue delay of receipt and in any event within 30 days. If we require additional time to provide access to your information, we will acknowledge receipt of your request within 30 days and promptly supplement our response within the time period required by applicable law.

If you do not sign in to your account or interact with our services, including continuing to receive emails from us, for a significant period of time, your account will expire and be scheduled for removal from our site. Expired accounts are deleted on a periodic basis. Our current expiration period is approximately 36 months; we may extend or reduce this period in order to adjust to changing hiring patterns. If your account contains a resume, you will receive an email from us before we delete your resume in this manner.

**Security**

**You are responsible for keeping your username and password secret.**

Monster takes appropriate measures to secure your personal information from accidental loss and from unauthorized access, use, alteration or disclosure. However, the Internet is an open system and we cannot guarantee that unauthorized third parties will not be able to defeat those measures or use your personal information for improper purposes. You can find additional information on conducting a safe job search in our Security Center. You should be aware that resumes and profiles may be monitored by your current employer.

When you place an order online at Monster, your credit card information is encrypted with industry standard encryption.

**Children**



Monster is not intended for, nor do we knowingly collect information from, children under the age of 13.

**Safe Harbor and International Transfers**

Monster complies with the U.S.-EU Safe Harbor Framework and the U.S.-Swiss Safe Harbor Framework as set forth by the U.S. Department of Commerce regarding the collection, use, and retention of personal information from European Union member countries and Switzerland. Monster has certified that it adheres to the Safe Harbor Privacy Principles of notice, choice, onward transfer, security, data integrity, access, and enforcement. To learn more about the Safe Harbor program, and to view Monster's certification, please visit: http://www.export.gov/safeharbor/. If you would like to contact us directly about the Safe Harbor program, please contact us.

Monster Worldwide, Inc. has received TRUSTe's Privacy Seal signifying that this Privacy Policy and our practices have been reviewed for compliance with the TRUSTe program viewable on the validation page available by clicking the TRUSTe seal. If you have an unresolved privacy or data use concern that we have not addressed satisfactorily, please contact TRUSTe at: https://feedback-form.truste.com/watchdog/request. Please click here for fax and postal mail information. TRUSTe's Dispute Resolution process is only available in English.

The TRUSTe program covers only information that is collected through this Web site or where this policy is linked from and does not cover information that may be collected through downloadable software, mobile applications or mobile websites at this time.

If you live outside the European Economic Area, Monster endeavors to comply with applicable law for the international transfer of your personal information.

**Changes to Privacy Policy**

If we decide to materially change the substance of this Privacy Policy, we will, where required, contact you via the email address that you maintain in your profile. We will also post those changes through a prominent notice on the site.

**Contact Information**

Your data is submitted to Monster Worldwide, Inc. and is hosted and stored in a database on servers situated in the United States owned and maintained by Monster Worldwide Technologies, LLC, a Delaware corporation, whose principal place of business is at 622 Third Avenue, New York 10017, New York, USA. Monster Worldwide, Inc., a Delaware corporation with its principal place of business at 133 Boston Post Road, Weston, MA 02493, USA, is the legal entity determining the purposes and means of processing the information gathered on Monster sites and applications and is the data controller of all data stored in the Monster database.

If, at any time, you have questions or concerns about this Privacy Policy, please contact us online or at:

Privacy Office
Monster Worldwide, Inc.
133 Boston Post Road
Weston, MA 02493

We will use reasonable efforts to promptly answer your question or resolve your problem. If you feel we have not properly addressed your question, you may contact TRUSTe.

**Notice to California Residents:** For more information on your California privacy rights, click here.

**Cookies and Online Advertising**

**Cookies:** Monster uses "cookies" to help personalize and maximize your online experience and time online, including for storing user preferences, improving search results and ad selection, and tracking user trends. A cookie is a text file stored on your computer. Cookies store bits of information that we use to help make our site work. They can't run any code and don't contain viruses. No one can read our cookies except us.

We use cookies to improve your experience on our sites. We use the following types of cookies:

- Security: These cookies allow us to secure access to your account.
- Preference: These cookies are used to store your preferences like language choice and display of job search results.
- Analytics: We track traffic patterns so we can identify popular content and potential problems.
- Features: We track which jobs you search for, view, and apply to so we can show you more jobs like those. We also use cookies to split some users into test groups to test new features.
- Advertising: We use non-identifiable information about you to show you advertising.

Some cookies will remain on your computer after you have left our site. Security cookies will remain for 60 days after your last visit. Poll response cookies will remain for 90 days, and Monster cookies relating to advertisements and site notices will remain for up to two years.

We also allow other companies to display advertisements to you while you are using our sites and applications. Because your web browser must request these advertisements from the other companies' servers, these companies can view, edit or set their own cookies, just as if you had requested a web page from their site. Monster has no control over, and is not responsible for, the practices of those third party advertisers. The data stored in these cookies is anonymous and the information is not linked to your personally identifiable information without your permission. The cookies placed by our third party ad servers will remain on your computer after you have left our site for up to 20 years unless you choose to delete them.

Monster also uses web beacons (sometimes called pixels, clear GIFs or action tags) and JavaScript.

**Advertising Opt Out:** Monster uses several third parties to help provide analytics services and to serve advertisements, including DoubleClick, Atlas Solutions and Omniture. Click here to see a list of many of the companies that Monster works with in connection with serving personalized ads. You can

opt out of third party cookies by setting your browser to decline cookies. Otherwise, if you do not wish to allow your session visitation information on our sites to be aggregated and analyzed by Omniture, or used by Omniture to tailor dynamic content to your specific interests, you may utilize the following opt out mechanism: www.omniture.com/en/privacy/policy#optout. Monster does not respond to web browser do not track signals. You can opt out of targeted advertising from networks Monster works with by clicking here.

We also use cookies in connection with our Career Ad Network ("CAN"). The CAN cookie is used to display relevant job ads to you on Monster and other websites. You can opt out of the CAN cookie here: http://can.monster.com/cookie-technology.aspx.

Please note if you delete your browser cookies, your opt-out cookie will also be deleted. Additionally, if you change computers or web browsers, you will need to opt out again.

Monster also uses "Flash cookies", also known as "Local Shared Objects", to preserve video player settings and for security purposes. You can adjust your settings for your Flash cookies here.

### Social Media and Content Sharing

**Social Media Widgets:** Our site includes social media features, such as the Facebook Like button and widgets, such as the Share This button. These features may collect your IP address and the page on our site you are visiting and may set a cookie to enable the feature to function properly. Social media features are either hosted by a third party or hosted directly on our Site. Your interactions with these features are governed by the privacy policy of the company providing it.

**Referrals:** If you choose to use our service to share site content with a friend, we will ask you for your friend's name and email address. We will automatically send your friend a one-time email inviting him or her to visit the site. Monster Worldwide, Inc. temporarily stores this information for the sole purpose of sending this one-time email.

Update effective March 31, 2014.

**Search Jobs:**

| Job title – e.g., accountant, sales | Any Skills or Keywords | in | City, State, or Zip code | **SEARCH** |

Advanced Search

For Employers: Post Jobs | Search Resumes | Advertise
Jobs in US | Jobs in Canada | Jobs in UK | Emplois en France | Jobs in Deutschland | Vacatures in Nederland
About Monster | Work for Monster | Advertise with Us | AdChoices      | Partner with Us | Investor Relations | Social Media
Terms of Use | Privacy Center | Accessibility Center | Help | Security | Contact Us | Sitemap | Mobile

©2015 Monster - All Rights Reserved U.S. Patents No. 5,832,497; 7,599,930 B1; 7,827,125 and 7,836,060 MWW - Looking for Monster Cable? - V: 2015.17.0.115-313 

# Exhibit 8

On Mon Feb 23 2015 at 2:36:35 AM TalentBin Support <talentbinsupport@monster.com> wrote:

**Subject**

TalentBin Profile View Request

**Discussion Thread**

**Response Via Email (Global Customer Service)**                     02/23/2015 08.36 AM

Hi Eric,

Thank you for your request to view a snapshot of your aggregated online profile. I am happy to help you with this.

I manage to locate a TalentBin profile associated with your Google Plus account. Before we can send you the snapshot we just need to verify your identity so that we can be 100% sure that we are selecting the correct profile.

All we need you to do to accomplish this is reply to this email, thereby verifying that you're the owner of this email address.

As soon as our team has verified this email address is yours, we will take action and send you a copy of your TalentBin by Monster profile.

With kind regards,

Monster Global Customer Service

[---001:000651:01813---]

# Exhibit 9



## Eric Halvorson 

I'm still trying to figure out what to put here.

| 💼 Work | Gustavus Adolphus College |
| 📖 Education | Gustavus Adolphus College |
| 💼 Years of experience | 6 years |



**Look up on:**     Google • LinkedIn ▾                    Similar Profiles • Share • Report

# Job History

### Production Supervisor
Media Services, Gustavus Adolphus College
January 2009 to present

### Night Crew
Target Corporation
January 2011 to January 2011

# Education History

### Student
Gustavus Adolphus College
2009 to 2011
Political Science

# Exhibit 10



# Nichols Kaster
## ATTORNEYS AT LAW

Megan Yelle
Direct: (612) 256-3232
Fax: (612) 215-6870
@nka.com

4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(877) 448-0492

9/18/2015

**VIA U.S. MAIL**

Talentbin, Inc.
799 Market St FL 5
San Francisco, CA 94103

RE:     Eric Halvorson
        SSN:
        DOB:

To Whom It May Concern:

I am writing on behalf of Eric Halvorson.  Pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681g, I am requesting a copy of **all information** in Eric Halvorson's file, and identification of all sources of that information, including:

21. All reports and other communications regarding Eric Halvorson, that you have sent to any third parties or to Eric Halvorson; **and**

22. Identification of all sources from which you directly or indirectly obtained information about Eric Halvorson; **and**

23. Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for employment purposes, during the 2-year period preceding the date on which this request is made; **and**

24. Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for purposes other than an employment purpose, during the 1-year period preceding the date on which this request is made; **and**

25. All reports and other communications regarding Eric Halvorson that you sent to or received from entities identified in paragraphs 1, 2, 3, or 4 above; **and**

26. The dates, original payees, and amounts of any checks upon which is based any adverse characterization of the consumer, included in the file at the time of the disclosure; **and**

27. A record of all inquiries received by the agency that identified Eric Halvorson in connection with a credit or insurance transaction that was not initiated by the me; **and**

28. To the extent not requested above, any and all information in Eric Halvorson credit file, including:



# Nichols Kaster
## ATTORNEYS AT LAW

    (k) Eric Halvorson credit score, including Eric Halvorson current credit score or most recent credit score previously calculated by you for a purpose related to the extension of credit;  **and**

    (l)  The range of possible credit scores under the credit scoring model used by you; **and**

    (m) All of the key factors that adversely affected Eric Halvorson credit score in the model used; **and**

    (n) The date on which the credit score was created; **and**

    (o) The name of the person or entity that provided the credit score or credit file upon which the credit score was created; **and**

29. All admissions, communications, and statements made by Eric Halvorson, **and**

30. Any other information in your possession about Eric Halvorson.

Please send this information to me forthwith. Thank you for your prompt attention to this request.

            Sincerely,

            Megan Yelle
            Attorney At Law

# Exhibit 11

On Thu, Apr 9, 2015 at 6:19 AM, TalentBin Support <talentbinsupport@monster.com> wrote:

Laura Ferrer

Technical Writer

**Response Via Email (Monster Worldwide)**                                    04/09/2015 02.19 PM

Hi Laura

Thank you for your request to view a snapshot of your aggregated online profile. I am happy to help you with this.

Before we can send you the snapshot we just need to verify your identity so that we can be 100% sure that we are selecting the correct profile.

All we need you to do to accomplish this is reply to this email, thereby verifying that you're the owner of this email address.

As soon as our team has verified this email address is yours, we will take action and send you a copy of your TalentBin by Monster profile.

With kind regards,

Monster Global Customer Service

[---001:001064:40960---]

--

Laura Ferrer

Technical Writer

# Exhibit 12

## Skills

| Professional/Personal | |
| --- | --- |
| ++ Analysis | Adobe Acrobat |
| ++ Communication | |
| ++ Computer Software | |
| ++ Documentation | |
| ++ Engineering | |
| ++ HTML | |
| ++ Job | |

## Job History

**Contract Technical Writer**
Synopsys, Mt. View, (through Roger Smith in Campbell)
July 2013 to March 2014

**Contract Technical Writer**
NetApp
May 2013 to March 2013

**Contract Technical Writer**
VMware
March 2013 to Aug 2013

**Contract Technical Writer**
Symantec, PCP division
October 2011 to January 2013

**Contract Technical Writer**
CMC
(System to August 2011)

**Contract Technical Writer**
CISCO MERIC—(through O Analysis, LLC)
October 2010 to March 2011

**Contract Sr. Technical Writer**
INGERSOLL-RAND SCHLAGE INDUSTRIES—(through Volten Technologies)
October 2008 to June 2009

**Contract Technical Writer**
IBM National Rural Forge
January 2008 to January 2009

**Employee**
Sun Microsystems
January 2006 to December 2006

**Sr. Technical Writer**
Hewlett-Packard
January 2005 to August 2005

**Sr. Technical Writer**
Engineering Consulting Company
February 1996 to January 2004

**Employee**
Techtален, Inc
January 2002 to December 2002

**Employee**
Broadware, Inc
January 2002 to November 2002

**Sr. Technical Writer**
SUN MICROSYSTEMS & ADL
September 2000 to January 2002

**Employee**
Jetstream Communications
January 2000 to November 2000

**Employee**
Harris Networks
January 2000 to December 2000

**Sr. Technical Writer**
Cisco Systems, Inc
January 1999 to January 2000

**Employee**
TIBCO, Inc
January 1998 to December 1997

**Sr. Technical Writer**
Clarify, Inc
April 1997 to November 1997

**Employee**
UB Networks
January 1995 to December 1998

**Sr. Technical Writer**
Oracle Corporation
December 1992 to January 1996

**Sr. Technical Writer (Employee and Contractor)**
SUN MICROSYSTEMS, SGA SYSTEMS
January 1991 to December 1993

**Sr. Technical Writer Consultant**
Roger Smith Consulting (in Synopsys)

# Exhibit 13



**Nichols Kaster**
ATTORNEYS AT LAW

Megan Yelle
Direct: (612) 256-3232
Fax: (612) 215-6870
@nka.com

4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(877) 448-0492

8/14/2015

<u>**VIA U.S. MAIL**</u>

Talentbin, Inc.
1550 Bryant Street
San Francisco, CA 94103

RE:   Laura Ferrer
      SSN:
      DOB:

To Whom It May Concern:

I am writing on behalf of Laura Ferrer. Pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681g, I am requesting a copy of **all information** in Laura Ferrer's file, and identification of all sources of that information, including:

1.  All reports and other communications regarding Laura Ferrer, that you have sent to any third parties or to Laura Ferrer; **and**

2.  Identification of all sources from which you directly or indirectly obtained information about Laura Ferrer; **and**

3.  Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for employment purposes, during the 2-year period preceding the date on which this request is made; **and**

4.  Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for purposes other than an employment purpose, during the 1-year period preceding the date on which this request is made; **and**

5.  All reports and other communications regarding Laura Ferrer that you sent to or received from entities identified in paragraphs 1, 2, 3, or 4 above; **and**

6.  The dates, original payees, and amounts of any checks upon which is based any adverse characterization of the consumer, included in the file at the time of the disclosure; **and**

7.  A record of all inquiries received by the agency that identified Laura Ferrer in connection with a credit or insurance transaction that was not initiated by the me; **and**

8.  To the extent not requested above, any and all information in Laura Ferrer credit file, including:



# Nichols Kaster
## ATTORNEYS AT LAW

(a) Laura Ferrer credit score, including Laura Ferrer current credit score or most recent credit score previously calculated by you for a purpose related to the extension of credit; **and**

(b) The range of possible credit scores under the credit scoring model used by you; **and**

(c) All of the key factors that adversely affected Laura Ferrer credit score in the model used; **and**

(d) The date on which the credit score was created; **and**

(e) The name of the person or entity that provided the credit score or credit file upon which the credit score was created; **and**

9. All admissions, communications, and statements made by Laura Ferrer, **and**

10. Any other information in your possession about Laura Ferrer.

Please send this information to me forthwith. Thank you for your prompt attention to this request.

Sincerely,

Megan Yelle
Attorney At Law

# Exhibit 14



**MONSTER**

## FIND BETTER

Megan Yelle
Nichols Kaster
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

August 25, 2015

**Dear Ms. Yelle:**

I am Associate General Counsel at Monster Worldwide, Inc. ("Monster"), parent company of TalentBin, Inc. ("TalentBin") and am writing to you in response to two letters TalentBin received from you dated August 14, 2015, one regarding information relating to Neil Young and another regarding information relating to Laura Ferrer (together, the "Requests").

Your letters state that the Requests are made "[p]ursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681g" (generally referred to herein as the "FCRA").   As such, we must respectfully decline to provide the information requested.

TalentBin is not a consumer reporting agency nor does it furnish consumer reports as defined by the FCRA, *see* 15 U.S.C. §1861a.  Further, any attempt to use our services as such would be a violation of TalentBin's and Monster's Terms of Use (http://inside.monster.com/terms-of-use), which state clearly, "**You may not use the Monster Content or Profiles to determine a consumer's eligibility for: (a) credit or insurance for personal, family, or household purposes; (b) employment; or (c) a government license or benefit.** *(emphasis in original).*"

The foregoing is asserted without prejudice to any rights or remedies of Monster and/or TalentBin, all of which are hereby expressly reserved.

Very truly yours,

**Levina Wong**
Associate General Counsel

CC:     Michael C. Miller, Executive Vice President, General Counsel & Secretary
        Evan Kornrich, Senior Vice President, Litigation & Chief Compliance Officer

133 Boston Post Road
Weston, MA 02493
MONSTER.COM

# Exhibit 15


# Nichols Kaster
## ATTORNEYS AT LAW

Megan Yelle
Direct: (612) 256-3232
Fax: (612) 215-6870
@nka.com

4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(877) 448-0492

8/14/2015

**VIA U.S. MAIL**

Talentbin, Inc.
1550 Bryant Street
San Francisco, CA 94103

**RE:**   Peter Dallman
        **SSN:**  ███████████
        **DOB:**  ███████████

To Whom It May Concern:

I am writing on behalf of Peter Dallman. Pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681g, I am requesting a copy of **all information** in Peter Dallman's file, and identification of all sources of that information, including:

31. All reports and other communications regarding Peter Dallman, that you have sent to any third parties or to Peter Dallman; **and**

32. Identification of all sources from which you directly or indirectly obtained information about Peter Dallman; **and**

33. Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for employment purposes, during the 2-year period preceding the date on which this request is made; **and**

34. Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for purposes other than an employment purpose, during the 1-year period preceding the date on which this request is made; **and**

35. All reports and other communications regarding Peter Dallman that you sent to or received from entities identified in paragraphs 1, 2, 3, or 4 above; **and**

36. The dates, original payees, and amounts of any checks upon which is based any adverse characterization of the consumer, included in the file at the time of the disclosure; **and**

37. A record of all inquiries received by the agency that identified Peter Dallman in connection with a credit or insurance transaction that was not initiated by the me; **and**

38. To the extent not requested above, any and all information in Peter Dallman credit file, including:



# Nichols Kaster
## ATTORNEYS AT LAW

(p) Peter Dallman credit score, including Peter Dallman current credit score or most recent credit score previously calculated by you for a purpose related to the extension of credit; **and**

(q) The range of possible credit scores under the credit scoring model used by you; **and**

(r) All of the key factors that adversely affected Peter Dallman credit score in the model used; **and**

(s) The date on which the credit score was created; **and**

(t) The name of the person or entity that provided the credit score or credit file upon which the credit score was created; **and**

39. All admissions, communications, and statements made by Peter Dallman, **and**

40. Any other information in your possession about Peter Dallman.

Please send this information to me forthwith. Thank you for your prompt attention to this request.

Sincerely,

Megan Yelle
Attorney At Law

# Exhibit 16



**FIND BETTER**

Megan Yelle
Nichols Kaster
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

September 9, 2015

**Dear Ms. Yelle:**

I am Associate General Counsel at Monster Worldwide, Inc. ("Monster"), parent company of TalentBin, Inc. ("TalentBin") and am writing to you in response to a letter TalentBin received from you dated August 14, 2015, regarding information relating Peter Dallman (the "Request").

Your letter states that the Request is made "[p]ursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681g" (generally referred to herein as the "FCRA").   As such, we must respectfully decline to provide the information requested.

TalentBin is not a consumer reporting agency nor does it furnish consumer reports as defined by the FCRA, *see* 15 U.S.C. §1861a.  Further, any attempt to use our services as such would be a violation of TalentBin's and Monster's Terms of Use (http://inside.monster.com/terms-of-use), which state clearly, "**You may not use the Monster Content or Profiles to determine a consumer's eligibility for: (a) credit or insurance for personal, family, or household purposes; (b) employment; or (c) a government license or benefit.** *(emphasis in original)*."

The foregoing is asserted without prejudice to any rights or remedies of Monster and/or TalentBin, all of which are hereby expressly reserved.

Very truly yours,

**Levina Wong**
Associate General Counsel

CC:     Michael C. Miller, Executive Vice President, General Counsel & Secretary
        Evan Kornrich, Senior Vice President, Litigation & Chief Compliance Officer

# Exhibit 17

On Mon, May 11, 2015 at 4:50 AM, TalentBin Support
<talentbinsupport@monster.com> wrote:





**Response Via Email (Monster Worldwide)**      05/11/2015 12:50 PM

Hi Robert

Thank you for your request to view a snapshot of your aggregated online profile. I am happy
to help you with this.

Before we can send you the snapshot we just need to verify your identity so that we can be
100% sure that we are selecting the correct profile.

All we need you to do to accomplish this is reply to this email, thereby verifying that you're
the owner of this email address.

As soon as our team has verified this email address is yours, we will take action and send you
a copy of your TalentBin by Monster profile.

With kind regards,

Monster Global Customer Service

[---001:001092:43819---]

--





Exhibit 18



## Skills

Professional Interests                                      Search

Digital Photography                    **Digital Photography**

- photographer              The concentration of this person's education is
- Photography               **Digital Photography**
- Acrobat
- Adobe                      This person exhibited an interest in **Digital**
- Adobe Acrobat              **Photography** from some other web activity.
- Adobe Creative Su...
- Automotive

## Job History

**Employee**
Parker Hannifin
March 2013 to present

**Photographer**
Robert Grana Photography
January 2010 to present

**Technical Writer**
American Honda Motor Co., Inc.
January 2006 to present

**Retail Manager**
September 2011 to February 2012

**Employee**
Estevan Oriol (Soul Assassins Studios)
September 2011 to December 2011

**Manager**
American Honda Motor
February 2007 to November 2007

**Customer Service Representative**
American Honda Motor
October 2006 to February 2007

**Manager**
Verizon
August 2006 to October 2006

**Customer Service Representative**
July 2005 to August 2006

## Education History

**Associate of Science (A.S.)**
The Art Institute of California – Hollywood
2009 to 2011
Digital Photography

**high school**

**High School**
South Gate Senior High

© TALENTBIN INC. 2015. ALL RIGHTS RESERVED.

# Exhibit 19



**Nichols Kaster**
ATTORNEYS AT LAW

Megan Pelle
Direct: (612) 256-3232
Fax: (612) 215-6870
@nka.com

4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(877) 448-0492

9/18/2015

**VIA U.S. MAIL**

Talentbin, Inc.
799 Market St FL 5
San Francisco, CA 94103

RE:    Robert Grana
      SSN: ███████
      DOB: ███████

To Whom It May Concern:

I am writing on behalf of Robert Grana.  Pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681g, I am requesting a copy of **all information** in Robert Grana's file, and identification of all sources of that information, including:

51. All reports and other communications regarding Robert Grana, that you have sent to any third parties or to Robert Grana; **and**

52. Identification of all sources from which you directly or indirectly obtained information about Robert Grana; **and**

53. Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for employment purposes, during the 2-year period preceding the date on which this request is made; **and**

54. Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for purposes other than an employment purpose, during the 1-year period preceding the date on which this request is made; **and**

55. All reports and other communications regarding Robert Grana that you sent to or received from entities identified in paragraphs 1, 2, 3, or 4 above; **and**

56. The dates, original payees, and amounts of any checks upon which is based any adverse characterization of the consumer, included in the file at the time of the disclosure; **and**

57. A record of all inquiries received by the agency that identified Robert Grana in connection with a credit or insurance transaction that was not initiated by the me; **and**

58. To the extent not requested above, any and all information in Robert Grana credit file, including:



# Nichols Kaster
## ATTORNEYS AT LAW

(z) Robert Grana credit score, including Robert Grana current credit score or most recent credit score previously calculated by you for a purpose related to the extension of credit; **and**

(aa)   The range of possible credit scores under the credit scoring model used by you; **and**

(bb)   All of the key factors that adversely affected Robert Grana credit score in the model used; **and**

(cc)   The date on which the credit score was created; **and**

(dd)   The name of the person or entity that provided the credit score or credit file upon which the credit score was created; **and**

59. All admissions, communications, and statements made by Robert Grana, **and**

60. Any other information in your possession about Robert Grana.

Please send this information to me forthwith. Thank you for your prompt attention to this request.

Sincerely,

Megan Yelle
Attorney At Law

# Exhibit 20

**Response Via Email (Monster Worldwide)**                    05/11/2015 12:59 PM

Hi Denny

Thank you for your request to view a snapshot of your aggregated online profile. I am happy to help you with this.

Before we can send you the snapshot we just need to verify your identity so that we can be 100% sure that we are selecting the correct profile.

All we need you to do to accomplish this is reply to this email, thereby verifying that you're the owner of this email address.

As soon as our team has verified this email address is yours, we will take action and send you a copy of your TalentBin by Monster profile.

With kind regards,

Monster Global Customer Service

[---001:001167:51590---]

--
Sent via phone. Please excuse brevity.
Denny Bulcao, Jr.

--
Sent via phone. Please excuse brevity.
Denny Bulcao, Jr.

Exhibit 21



Exhibit 22



## Nichols Kaster
### ATTORNEYS AT LAW

**Megan Yelle**
Direct: (612) 256-3232
Fax: (612) 215-6870
@nka.com

4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(877) 448-0492

9/18/2015

**VIA U.S. MAIL**

Talentbin, Inc.
799 Market St FL 5
San Francisco, CA 94103

**RE:**  Denny Bulcao
**SSN:**  ████████
**DOB:**  ████████

To Whom It May Concern:

I am writing on behalf of Denny Bulcao.  Pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681g, I am requesting a copy of **all information** in Denny Bulcao's file, and identification of all sources of that information, including:

21. All reports and other communications regarding Denny Bulcao, that you have sent to any third parties or to Denny Bulcao; **and**

22. Identification of all sources from which you directly or indirectly obtained information about Denny Bulcao; **and**

23. Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for employment purposes, during the 2-year period preceding the date on which this request is made; **and**

24. Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for purposes other than an employment purpose, during the 1-year period preceding the date on which this request is made; **and**

25. All reports and other communications regarding Denny Bulcao that you sent to or received from entities identified in paragraphs 1, 2, 3, or 4 above; **and**

26. The dates, original payees, and amounts of any checks upon which is based any adverse characterization of the consumer, included in the file at the time of the disclosure; **and**

27. A record of all inquiries received by the agency that identified Denny Bulcao in connection with a credit or insurance transaction that was not initiated by the me; **and**

28. To the extent not requested above, any and all information in Denny Bulcao credit file, including:



## Nichols Kaster
### ATTORNEYS AT LAW

(k) Denny Bulcao credit score, including Denny Bulcao current credit score or most recent credit score previously calculated by you for a purpose related to the extension of credit; **and**

(l) The range of possible credit scores under the credit scoring model used by you; **and**

(m) All of the key factors that adversely affected Denny Bulcao credit score in the model used; **and**

(n) The date on which the credit score was created; **and**

(o) The name of the person or entity that provided the credit score or credit file upon which the credit score was created; **and**

29. All admissions, communications, and statements made by Denny Bulcao, **and**

30. Any other information in your possession about Denny Bulcao.

Please send this information to me forthwith. Thank you for your prompt attention to this request.

Sincerely,

Megan Yelle
Attorney At Law

www.nka.com

# Exhibit 23

> Response Via Email (Monster
> Worldwide)04/01/2015 01.31
> PM
> Hi Neil
>
> Thank
> you for your request to view a snapshot of your aggregated online
> profile. I am happy to help you with this.
>
> Before we can
> send you the snapshot we just need to verify your identity so that we
> can be 100% sure that we are selecting the correct profile.
>
> All
> we need you to do to accomplish this is reply to this email, thereby
> verifying that you're the owner of this email address.
>
> As
> soon as our team has verified this email address is yours, we will
> take action and send you a copy of your TalentBin by Monster profile.
>
> With
> kind regards,
>
> Monster Global
> Customer Service
>
>
>
>
>
> [---001:001797:34226---]
>

Exhibit 24

--- On Thu, 4/9/15, TalentBin Support <talentbinsupport@monster.com> wrote:

> From: TalentBin Support <talentbinsupport@monster.com>
> Subject: TalentBin Profile View Request [Incident: 150401-001964]
> To: ███████████████████████████████
> Date: Thursday, April 9, 2015, 12:05 AM
>
>
>
>
>
> #yiv4547409034 td.yiv4547409034header  {}
> #yiv4547409034 td.yiv4547409034text
> {padding-left:4px;padding-right:4px;}
> #yiv4547409034 td.yiv4547409034label    {}
> #yiv4547409034 td.yiv4547409034data     {}
> #yiv4547409034 p {margin-bottom:0;}
> #yiv4547409034 p.yiv4547409034MsoNormal, #yiv4547409034
> li.yiv4547409034MsoNormal, #yiv4547409034 div.yiv4547409034MsoNormal
> {margin:0;}
> #yiv4547409034 p.yiv4547409034MsoListParagraph,
> #yiv4547409034 li.yiv4547409034MsoListParagraph,
> #yiv4547409034 div.yiv4547409034MsoListParagraph
> {margin-left:48px;margin-bottom:0;margin-top:0;}
>
>
> TalentBin Profile View Request
>
>
>
>
>
>
>
>
>
>
>
>
>

Exhibit 25



# Nichols Kaster
## ATTORNEYS AT LAW

**Megan Yelle**
Direct: (612) 256-3232
Fax: (612) 215-6870
@nka.com

4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(877) 448-0492

8/14/2015

**VIA U.S. MAIL**

Talentbin, Inc.
1550 Bryant Street
San Francisco, CA 94103

RE:   Neil Young
      **SSN:**
      **DOB:**

To Whom It May Concern:

I am writing on behalf of Neil Young. Pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681g, I am requesting a copy of **all information** in Neil Young's file, and identification of all sources of that information, including:

11. All reports and other communications regarding Neil Young, that you have sent to any third parties or to Neil Young; **and**

12. Identification of all sources from which you directly or indirectly obtained information about Neil Young; **and**

13. Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for employment purposes, during the 2-year period preceding the date on which this request is made; **and**

14. Identification of each person (including each end-user identified under section 15 U.S.C. 1681e(e)(1)) that procured a consumer report for purposes other than an employment purpose, during the 1-year period preceding the date on which this request is made; **and**

15. All reports and other communications regarding Neil Young that you sent to or received from entities identified in paragraphs 1, 2, 3, or 4 above; **and**

16. The dates, original payees, and amounts of any checks upon which is based any adverse characterization of the consumer, included in the file at the time of the disclosure; **and**

17. A record of all inquiries received by the agency that identified Neil Young in connection with a credit or insurance transaction that was not initiated by the me; **and**

18. To the extent not requested above, any and all information in Neil Young credit file, including:

www.nka.com



**Nichols Kaster**
ATTORNEYS AT LAW

    (f) Neil Young credit score, including Neil Young current credit score or most recent credit score previously calculated by you for a purpose related to the extension of credit; **and**

    (g) The range of possible credit scores under the credit scoring model used by you; **and**

    (h) All of the key factors that adversely affected Neil Young credit score in the model used; **and**

    (i) The date on which the credit score was created; **and**

    (j) The name of the person or entity that provided the credit score or credit file upon which the credit score was created; **and**

19. All admissions, communications, and statements made by Neil Young, **and**

20. Any other information in your possession about Neil Young.

Please send this information to me forthwith. Thank you for your prompt attention to this request.

Sincerely,

Megan Yelle
Attorney At Law

---

# Exhibit 26

Case 3:15-cv-05166-JCS   Document 1-1   Filed 11/10/15   Page 134 of 173

# Want to see your TalentBin profile?

Just fill out the form below and we will be in touch shortly. Or, if you want to explore the new social recruiting platform yourself, you can create a free account at www.talentbin.com (https://www.talentbin.com).

You will need to provide your email address and a social profile you own so we can locate and verify your profile. In order to verify your identity, you may need to provide a copy of a government-issued photo ID. We will not use any of the information submitted below for any purpose other than confirming your identity and responding to your request.

**Note:** We can only remove web identities currently on the TalentBin site (they are all we know right now!). If new identities are discovered and added to the site in the future, you will need to submit another request.

**Your name**

| Please enter your name |
|---|

**Your email**

| Please enter your email |
|---|

**A social web profile you own (so we can verify your identity)**

| Please enter the URL of a social web profile you own, like LinkedIn, Facebook, or Twitter |
|---|

**How can we help?**

○ Please send me a copy of my candidate profile

○ Please remove my profile so companies can't find me and send me job offers

**SUBMIT**



**FEATURES**

Find
(/features#find)
Engage
(/features#engage)
Manage
(/features#manage)
Collaborate
(/features#collaborate)
Success
(/features#success)
Everywhere
(/features#everywhere)

**RECOGNITION**

Press
Accolades
(/recognition)
Awards
(/recognition)
Testimonials
(/recognition)
Customers
(/recognition)

**RESOURCES**

Recruiting
resources
(/resources#technical-
recruiting-
resources)
Types of
recruiting
(/resources#different-
types-of-
recruiting)
Video
walkthroughs
(/resources#video-
walkthroughs)

**MORE**

Browser
PlugIn
(https://chrome.google.com/webstore/detail/social-
lookup-by-
talentbi/ppomfpehkfdkngfbaajgjllonjlnjdeh)
Careers
(/careers)

**CONTACT**

Request a
demo
(/request-a-demo)
Remove your
profile
(/profileinquiry)
Support
(http://support.talentbin.com)
(415) 361-
5456

**SOCIAL**


(https://twitter
.com/talentbin)

© TALENTBIN INC 2015. ALL RIGHTS RESERVED.      Privacy (http://inside.monster.com/policy/inside2.aspx)      Terms
(http://inside.monster.com/terms-of-use)

Czech (?lang=cs_cz) | Danish (?lang=da_dk) | Dutch (?lang=nl_nl) | English (?lang=en_us) | English (UK) (?lang=en_gb) | French (?
lang=fr_fr) | German (?lang=de_de) | Italian (?lang=it_it) | Norwegian (?lang=no_no) | Polish (?lang=pl_pl) | Spanish (?lang=es_es) |
Swedish (?lang=sv_se)

# Exhibit 27

| Search Resource Center | $\mathbf{Q}$ |
| --- | --- |

Home (/hr/hr-best-practices.aspx)
  /  Recruiting and Hiring Advice (/hr/hr-best-practices/recruiting-hiring-advice.aspx)
  /  Acquiring Candidates (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates.aspx)

# Social Media Recruiting: Understand the Legal Guidelines

(http://oas.monster.com/RealMedia/ads/click_lx.ads/us.monster.en/hiring/social-media-recruiting-guidelines/1986652612/Middle1/default/empty.gif/7a2f7276726c5878683355414264387a?x)



**By: Melanie Berkowitz, Esq. (/hr/hr-best-practices/market-intelligence/writers/melanie-berkowitz.aspx)**

There's no question that social media is changing the way business works -- and the trend goes well beyond marketing. Savvy companies are looking to social media trends (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/guide-to-social-media-and-work.aspx) to assist with their recruiting and hiring.

Lest you think social media is too complicated or just a phase, remember, a decade ago, using background screening (/hr/hr-best-practices/hr-events/past-hr-events/monster-background-screening-webinar.aspx) to help with recruiting was still a novel idea. Before you jump in, make sure you understand the legalities of social media. Using a bit of common sense never hurts either.



**Keep your Candidate Research Legal**

One of the easiest ways to use <u>social media is for recruiting (/hr/hr-best-practices/recruiting-hiring-advice/job-screening-techniques/social-media-recruitment.aspx)</u> to review an applicant's own public postings and accounts, providing a better picture of him or her as a potential employee. But be careful. Once you review a candidate's online profile, a court will assume you are aware of that person's "<u>protected characteristics (http://www.eeoc.gov/laws/types/index.cfm)</u>" that are often part of their online postings.

These characteristics include gender and race as well as those that are not always evident in a face-to-face interview such as religion, age, sexual orientation or disability. In such cases employers need to be particularly careful not to expand their <u>interview questions (/hr/hr-best-practices/recruiting-hiring-advice/interviewing-candidates/interview-questions-to-ask.aspx )</u> or decision-making beyond <u>legal interview (/hr/hr-best-practices/recruiting-hiring-advice/interviewing-candidates/legal-job-interview-questions.aspx)</u> limits.

But what if a candidate's profile suggests that he or she may not be appropriate for the position -- or even shows a lack of candor about their background or abilities? Here are a few such scenarios:

- A female candidate has numerous postings on her Facebook account about her "pig" of an ex-husband who constantly skips his time with their children, causing her to miss work at her current job.

- An applicant has applied for a job that requires heavy lifting and a lot of walking but whose online profiles reveals that he uses a cane.

"If you choose to review social media as part of your hiring practices, it's a better practice to wait until after you've met a candidate face to face," says David Baffa, labor and employment partner at national law firm <u>Seyfarth Shaw (http://www.seyfarth.com )</u>, LLP. By using social media in this more targeted way, says Baffa, "you are less likely to be accused of making snap selection decisions or of relying on protected characteristics evident from a social network profile." Mr. Baffa also counsels consistency:

- If you decide to use <u>social media in your recruiting process (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/recruiting-via-social-media.aspx)</u>, make sure you conduct the same searches at the same point in the process for every applicant.

- Be sure to print or save screen shots if you see something that causes you to question the candidate's candor, professionalism or judgment.

- If you use an outside company to perform the background check, you must adhere to the requirements of the "Fair Credit Reporting Act (http://www.ftc.gov/os/statutes/031224fcra.pdf )."

**Use Social Media Info Legally**

There is plenty of lawful information to be had from social media, though. Does your candidate have a Twitter account that she regularly updates with thoughtful "tweets"? Does his social media presence demonstrate a deeper interest in the type of job he is pursuing?

While social media should not be used to make final employment decisions, it can be used as an extension of the resume, a conversation starter that gives the interviewer a deeper understanding of the candidate. This is particularly true if familiarity with social media in business is needed for the position at issue. A candidate for a marketing job that knows how to market herself via Facebook should stand out among otherwise equally-qualified job seekers.

**Review and Audit your own Social Media Presence**

When it comes to using social media to research, remember, it goes both ways. Assume that applicants and new hires could be searching you (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/social-media-and-hiring.aspx ) and your company and even trying to figure out the identity of possible interviewers ahead of time.

Of course it would be ideal to have a strong social media presence that creates a strong company brand (/hr/hr-best-practices/recruiting-hiring-advice/strategic-workforce-planning/company-branding.aspx) and supports your small business marketing strategy (/hr/hr-best-practices/recruiting-hiring-advice/strategic-workforce-planning/small-business-marketing-strategy.aspx ) consumers and job seekers useful information about your company. But not every business has the time or resources to generate a social media marketing plan (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates/social-media-marketing.aspx) and online content strategy (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/social-media-marketing.aspx ).

At minimum, make sure that whatever materials you have are accurate and legal. Things to consider:

- Make sure that your company's profile states that the business is an "equal opportunity employer."

- Do not make statements that could be construed as a promise of employment or business opportunity; particularly if the site is "live" and uses employees to add comments or blog postings. For example a job posting that states, "This is a great

place to work," is fine. Promising that "All applicants will be hired," is obviously not.

- Know exactly who in your company or whether a third-party vendor is able to add to or change the content on the company's profile; make sure that it is consistent with other marketing and advertising messages.

## Treat "Bad" Social Media Information Delicately

Social media law is constantly evolving as in the ground-breaking NLRB Facebook case (/hr/hr-best-practices/workforce-management/hr-management-skills/social-media-guidelines.aspx ).

Although such cases will certainly give employer pause, an attorney familiar with employment issues, privacy, and the evolving law of social media can help determine the best course of action.

While it's not always entirely clear what a potential employer can legally do with a candidate who has denounced his or her current boss on a social media site, you can create a social media policy (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/social-media-policy.aspx) as part of your social media strategy (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/social-media-strategies.aspx).

What about the more run-of-the-mill negative information that reflects poorly on the job candidate's professional image -- such as pictures of a job applicant getting drunk and acting stupid, or comments that reveal ignorance or bigotry? Treat it the same way you would if you had gained the knowledge via the interview or in a resume.

But remember, a candidate may not control every image posted on a social media site, so consider the overall context. If you have lingering questions, consider consulting an attorney who is well-versed in social media before relying on negative information to justify an employment decision.

## Give the Job Applicant Fair Notice

It's not necessary to have an applicant sign a waiver that allows you to review his or her social media accounts; it is a best practice to give them a "heads up" that you will be reviewing any and all "publicly posted social media accounts."

Chances are, if a candidate uses social media as an effective job-hunting tool, or has interesting things to say via social media, he or she is likely going to publicize their online presence anyway.

*Legal Disclaimer: None of the information provided herein constitutes legal advice on behalf of Monster.*

Visit the **MonsterThinking** (http://www.monsterthinking.com/)**blog to read more: Social Media and Employment Law: Six Things You Need to Know** (http://www.monsterthinking.com/2011/03/02/social-media-and-employment-law/).

---

## Related Articles

- How to Target Talent Efficiently with Customized Email (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates/how-to-target-talent.aspx)
- Staffing Trends: How Will 2015 Close Out? (/hr/hr-best-practices/recruiting-hiring-advice/strategic-workforce-planning/second-half-2015-staffing-trends.aspx)
- Attract Millennials with your Employer Branding (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/attracting-Millennials.aspx)
- The Importance of Mobile on the Job Apply Process (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/mobile-job-apply.aspx)
- You're Invited to a Monster Power Recruiter Workshop (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/power-recruiter-workshops.aspx)

---

**M** (http://www.monster.com)

About Monster (http://www.monster.com/about) | Work for Monster (http://www.monster.com/about/work-for-us) | Partner with us (http://partner.monster.com/) | Using Monster (http://hiring.monster.com/hr/hr-best-practices/monster-training.aspx) | Occupational Trends (http://hiring.monster.com/hr/hr-best-practices/market-intelligence/occupational-reports.aspx) Investor Relations (http://ir.monster.com) | Social Media (http://career-services.monster.com/social-media/home.aspx) | Terms of Use (http://inside.monster.com/terms-of-use) | Privacy Center (http://inside.monster.com/privacy/home.aspx) | OFCCP Info (http://hiring.monster.com/hr/hr-best-practices/workforce-management/employee-benefits-management/OFCCP.aspx) | Help (http://monster-usen.custhelp.com/app/answers/list) | Security (http://inside.monster.com/security-center/home.aspx) | Contact Us (http://monster-usen.custhelp.com/app/ask) | Site Map (http://hiring.monster.com/sitemap.aspx)

Find us on Google+ (https://plus.google.com/+monster)

Copyright © 2015  |  Monster Worldwide (http://www.monster.com/) (NYSE: MWW (http://finance.aol.com/quotes/monster-

worldwide-inc/mww/nys))


U.S. Patents No. 5,832,497; 7,599,930 B1; 7,827,125 and 7,836,060 V: 2015.17.0.29-204-

# Exhibit 28

| Search Resource Center | **Q** |
|---|---|

Home (/hr/hr-best-practices.aspx)
 / Recruiting and Hiring Advice (/hr/hr-best-practices/recruiting-hiring-advice.aspx)
 / Acquiring Candidates (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates.aspx)

# Recruitment Strategies: Virtual Recruitment Tools and Tactics

(http://oas.monster.com/RealMedia/ads/click_lx.ads/us.monster.en/hiring/virtual-recruitment-strategies/1903265459/Middle1/default/empty.gif/7a2f7276726c5878683355414264387a?x)



**By: Melanie Berkowitz, Esq. (/hr/hr-best-practices/market-intelligence/writers/melanie-berkowitz.aspx)**

Do you remember the Jetsons -- the futuristic cartoon that featured flying cars, beds that made themselves and, with a touch of a button, long-distance "face to face" conversations? One episode even depicted a robot in charge of recruiting and hiring.

Technology has certainly become an integral part of today's hiring process. (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/social-media-hiring-process.aspx) In fact, it's now feasible for a job applicant to not visit the worksite or even shake hands with his or her future boss until right before –– or even after -- receiving a job offer. In fact, virtual recruiting has the potential to save time and money in an age when recruiters and companies are often inundated with hundreds – or even thousands -- of resumes for review (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/resume-review.aspx). Yet it also raises legal and practical considerations.

Employers who follow a few best practices with their virtual recruitment strategy will have the most success -- and fewest missteps -- when it comes to using technology with new recruiting strategies (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/new-recruiting-strategies.aspx).

## How to Conduct a Legal Interview -- Virtually

In some ways, virtual interviews raise the same legal issues as traditional recruitment strategies. Whether the interview process (/hr/hr-best-practices/recruiting-hiring-advice/interviewing-candidates/job-interview-process.aspx) is conducted by a recruiter, a prospective supervisor, or an on-line "pre-screen" computer program, interview questions (/hr/hr-best-practices/recruiting-hiring-advice/interviewing-candidates/interview-questions-to-ask.aspx ) must not violate EEOC guidelines (http://www.eeoc.gov/laws/practices/index.cfm) to maintain a legal hiring process (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates/legal-hiring-process.aspx). Also, interview questions cannot discriminate on the basis of a candidate's protected characteristics, including race, color, religion, sex (including pregnancy), national origin, age (40 or older), disability or genetic information.

Because virtual interviewing provides employers with the opportunity to ask each candidate the same question in the exact same way, helping to reduce the chance of a misstep on the part of the interviewee. By the same token, however, an improperly worded interview question or unlawful subject matter that's included in the virtual interview could create widespread problems.

As with traditional recruitment strategies, employers should work with employment lawyers and human resource professionals to insure that their interviewing techniques (/hr/hr-best-practices/recruiting-hiring-advice/interviewing-candidates/interview-techniques.aspx) and questions are lawful and appropriate and their interviewers and decision-makers are trained in non-discrimination practices.

## Reaching a Wider Selection of Candidates

For companies that are concerned about reaching a diverse applicant pool or demonstrating that they are an "equal opportunity employer," virtual technology can actually help employers to recruit across a much wider area.

For example, Job Search Television Network (http://www.myjstn.com/) allows companies to create a "virtual open house" for interested job applicants. "With a virtual open house, employers can easily market themselves to potential employees all over the country without having to spend the time and money attending in-person job fairs," explains

Lindsay Stanton, Senior Vice President of Sales and Strategy. "Candidates simply log in and are connected with a recruiter for a real-time, "face to face" discussion about the company at issue."

Using tools such as the virtual open house allow employers to target job candidates (/hr/hr-best-practices/recruiting-hiring-advice/job-screening-techniques/targeting-job-candiates.aspx) from faraway places, helping to diversify the applicant pool. It can also help level the playing field between those applicants who have the opportunity to speak to a recruiter and those who would otherwise have to submit a resume without any personal contact. "When a recruiter has a plethora of resumes to review, having "met" a candidate at a virtual job fair helps make a connection that wouldn't be there otherwise," says Stanton.

### Get Appropriate Waivers and Releases

Just as you would in other situations, you'll want to find a reputable vendor "if you want to use video interviewing or online pre-screening to find top talent," says Kevin Grossman, founder and principal of Marcom HRsay (http://www.marcomhrsay.com ). "The company should provide consent forms and disclosures that inform candidates as to what exactly is being recorded, whether it is voice-only, voice and image, or simply the answers to questions they type into the computer." Grossman adds that a proper disclosure will also explain how the recording will be used by the prospective employer.

Also, be aware that some virtual recruiting tools may implicate the Fair Credit Reporting Act (http://www.ftc.gov/os/statutes/fcrajump.shtm ). If an employer uses an outside company to pre-screen applicants, the vendor may be considered a "consumer reporting agency", in which case both vendor and employer are required to meet a number of legal requirements (http://business.ftc.gov/documents/bus08-using-consumer-reports-what-employers-need-know) which include having candidates sign a release.

### Virtual Recruiting Tools for both Large and Small Companies

If your company is new to virtual recruiting, the multitude of available products and tools can be daunting. Employers who have built their reputation on personal relationships may worry that automation will be at odds with their culture-based recruiting (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/culture-based-recruiting.aspx) strategy.

Experts agree that virtual recruiting will never completely replace the in-person interview, but that when used appropriately for targeted purposes and positions, it can add value to every hire.

"Virtual recruiting is particularly useful -- even for a smaller company -- at the screening stage," explains Grossman. "Using an online screening product, where an applicant logs in and answers a series of "gatekeeping" questions, helps narrow the field to qualified applicants without using a lot of man-hours."

Dianne Michels, CEO and founder of Serendipity HR (http://serendipityhr.com/), agrees. "Online screens are a useful tool for getting a large amount of consistent information from a number of candidates, so you can decide who to take to the next level."

Michels cautions employers to be more selective, however, when using virtual interviewing products. "For some jobs and some organizations, you can only assess the intangible "fit" of a candidate with an in-person meeting," she explains. "And remember, you may need to sell your company to the candidate too, and it's hard to communicate culture and environment over a video screen."

To combat that concern, Grossman suggests using virtual interviews to hire for positions that will utilize video technology on a regular basis. "'Face-to-face' with a customer means something different in today's business," he explains. "Customer service, sales, marketing and business development roles already conduct a lot of business "virtually." Grossman says that companies will want to hire employees who are comfortable with the medium for these types of positions.

### The Importance of Onboarding in Virtual Recruitment

Once hired, employees who have been "virtually" recruited may have a more difficult time feeling connected to their employer, particularly if they have never visited the workplace. It is up to the employer to make certain that these employees are taken through an onboarding process (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates/employee-onboarding-processUS.aspx) to ease their transition.

"It's important to make all new employees feel like they are an integrated part of the workplace, says Michels. "But when you are talking about someone who might not have visited the office before being hired, a well-planned onboarding process can mean the difference between a successful employee and redoing the job search next year."

Even with these challenges, Grossman sees virtual recruiting as an efficient and effective way for employers to create a 'short list' of candidates to meet face-to-face before making a final decision, adding, "This combination of automation and individuality gives companies the most opportunities to find top talent that fits their workplace and culture."

*Legal Disclaimer: None of the information provided herein constitutes legal advice on behalf of Monster.*

## Related Articles

- How to Target Talent Efficiently with Customized Email (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates/how-to-target-talent.aspx)
- Staffing Trends: How Will 2015 Close Out? (/hr/hr-best-practices/recruiting-hiring-advice/strategic-workforce-planning/second-half-2015-staffing-trends.aspx)
- Attract Millennials with your Employer Branding (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/attracting-Millennials.aspx)
- The Importance of Mobile on the Job Apply Process (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/mobile-job-apply.aspx)
- You're Invited to a Monster Power Recruiter Workshop (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/power-recruiter-workshops.aspx)

---

 (http://www.monster.com)

About Monster (http://www.monster.com/about) | Work for Monster (http://www.monster.com/about/work-for-us) | Partner with us (http://partner.monster.com/) | Using Monster (http://hiring.monster.com/hr/hr-best-practices/monster-training.aspx) | Occupational Trends (http://hiring.monster.com/hr/hr-best-practices/market-intelligence/occupational-reports.aspx) Investor Relations (http://ir.monster.com) | Social Media (http://career-services.monster.com/social-media/home.aspx) | Terms of Use (http://inside.monster.com/terms-of-use) | Privacy Center (http://inside.monster.com/privacy/home.aspx) | OFCCP Info (http://hiring.monster.com/hr/hr-best-practices/workforce-management/employee-benefits-management/OFCCP.aspx) | Help (http://monster-usen.custhelp.com/app/answers/list) | Security (http://inside.monster.com/security-center/home.aspx) | Contact Us (http://monster-usen.custhelp.com/app/ask) | Site Map (http://hiring.monster.com/sitemap.aspx)

Find us on Google+ (https://plus.google.com/+monster)

Copyright © 2015 | Monster Worldwide (http://www.monster.com/) (NYSE: MWW (http://finance.aol.com/quotes/monster-

worldwide-inc/mww/nys))

U.S. Patents No. 5,832,497; 7,599,930 B1; 7,827,125 and 7,836,060 V: 2015.17.0.29-205-

# Exhibit 29



| Search Resource Center | **Q** |
|---|---|

Home (/hr/hr-best-practices.aspx)
  / Recruiting and Hiring Advice (/hr/hr-best-practices/recruiting-hiring-advice.aspx)
  / Screening Candidates (/hr/hr-best-practices/recruiting-hiring-advice/job-screening-techniques.aspx)

# The Ins and Outs of Hiring a Consumer Reporting Agency

(http://oas.monster.com/RealMedia/ads/click_lx.ads/us.monster.en/hiring/consumer-reporting-agencies/960807225/Middle1/default/empty.gif/7a2f7276726c5878683355414264387a?x)

**By: Melanie Berkowitz, Esq. (/hr/hr-best-practices/market-intelligence/writers/melanie-berkowitz.aspx)**



There are many reasons that employers -- both large and small -- may wish to investigate the backgrounds of job applicants and employees. Identifying job candidates who lie on their resumes or job applications is one reason; complying with state or federal laws that require background checks for certain categories of jobs is another. But conducting accurate and timely background checks can be tricky and time consuming for many businesses. Hiring an outside company known as a consumer reporting agency, or CRA, to perform a background check can help almost any business, no matter its size. A CRA can help uncover applicants who submit false information when applying for a job.

The federal Fair Credit Reporting Act (FCRA) has a number of requirements for employers who wish to use a CRA to conduct background checks on job applicants or current employees. The report a CRA provides to the employer is called a "consumer report."  If an employer uses a CRA to perform background checks on job applicants or current employees, it must:

- Clearly tell the candidate or employee that the employer is going to conduct a background check. The disclosure must be made on a separate document. It cannot be part of the employment application; and

- The individual must first sign a document authorizing the background check.

If an employer decides to take an "adverse action" based on the information in the consumer report (such as not hiring an applicant or terminating an employee), the FCRA has other requirements (http://www.ftc.gov/os/2004/11/041119factaapph.pdf) an employer must follow when notifying the individual of its decision.  First, prior to taking the adverse action (sometimes referred to as the pre-adverse action), the employer must provide the applicant or employee two notices:

- A copy of the report obtained from the CRA; and

- A summary of the individual's rights under the FCRA.  This summary is a standard document created by the Federal Trade Commission (http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre35.pdf)

After giving the applicant or employee these notices, the employer is required to wait for approximately five days before actually taking the adverse action.  After the adverse action is taken, the employer must provide a number of other notices to the applicant or employee:

- Notice of the adverse action taken;

- The name, address, and toll free telephone number of the CRA that provided the consumer report;

- A statement that the CRA did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken;

- Notice of the consumer's right to obtain a free copy of the consumer report from the CRA within 60 days; and

- Notice of the consumer's right to dispute the accuracy or completeness of any information in the consumer report furnished by the CRA.

When ordering a background check from a CRA, employers need to be aware of particular laws regarding the use of such information. For example, although the FCRA allows the reporting of arrest information going back seven years, some states prohibit employers from considering whether a job applicant has ever been arrested (but not convicted) of a crime. Therefore, employers need to make sure they are familiar with the specific laws of their state before making an employment decision based on the information from a background check.

Although instituting a background checking program can be a big step for an employer, the benefits are almost always worth the time and effort. The costs of instituting a good background check process are slight compared to the costs that can be associated with hiring an individual who lies on his or her resume or job application and who later goes on to steal from the company, drive a company car while drunk, engage in workplace violence, or worse. The background check process can help employers reduce or eliminate such risks.

*None of the information provided herein constitutes legal advice on behalf of Monster.*

---

## Related Articles

- How to Target Talent Efficiently with Customized Email (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates/how-to-target-talent.aspx)
- Staffing Trends: How Will 2015 Close Out? (/hr/hr-best-practices/recruiting-hiring-advice/strategic-workforce-planning/second-half-2015-staffing-trends.aspx)
- Attract Millennials with your Employer Branding (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/attracting-Millennials.aspx)
- The Importance of Mobile on the Job Apply Process (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/mobile-job-apply.aspx)
- You're Invited to a Monster Power Recruiter Workshop (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/power-recruiter-workshops.aspx)

---

 (http://www.monster.com)

About Monster (http://www.monster.com/about) | Work for Monster

(http://www.monster.com/about/work-for-us) | Partner with us (http://partner.monster.com/) | Using

Monster (http://hiring.monster.com/hr/hr-best-practices/monster-training.aspx) | Occupational Trends

(http://hiring.monster.com/hr/hr-best-practices/market-intelligence/occupational-reports.aspx)

Investor Relations (http://ir.monster.com) | Social Media (http://career-services.monster.com/social-

media/home.aspx) | Terms of Use (http://inside.monster.com/terms-of-use) | Privacy Center

(http://inside.monster.com/privacy/home.aspx) | OFCCP Info (http://hiring.monster.com/hr/hr-best-

practices/workforce-management/employee-benefits-management/OFCCP.aspx) | Help (http://monster-

usen.custhelp.com/app/answers/list) | Security (http://inside.monster.com/security-center/home.aspx)

| Contact Us (http://monster-usen.custhelp.com/app/ask) | Site Map

(http://hiring.monster.com/sitemap.aspx)

Find us on Google+ (https://plus.google.com/+monster)

Copyright © 2015 | Monster Worldwide (http://www.monster.com/) (NYSE: MWW (http://finance.aol.com/quotes/monster-

worldwide-inc/mww/nys))

U.S. Patents No. 5,832,497; 7,599,930 B1; 7,827,125 and 7,836,060 V: 2015.17.0.29-206-

# Exhibit 30

| Search Resource Center | **Q** |
|---|---|

Home (/hr/hr-best-practices.aspx)  /  Small Business (/hr/hr-best-practices/small-business.aspx)
 /  News (/hr/hr-best-practices/small-business/news.aspx)

# New 2013 Forms for Employee Background Checks

(http://oas.monster.com/RealMedia/ads/click_lx.ads/us.monster.en/hiring/employee-
background-
checks/1961998295/Middle1/default/empty.gif/7a2f7276726c5878683355414264387a?x)

**By: <u>Melanie Berkowitz, Esq. (/hr/hr-
best-practices/market-
intelligence/writers/melanie-
berkowitz.aspx)</u>**

Do you conduct employee <u>background
checks (/hr/hr-best-
practices/recruiting-hiring-advice/job-
screening-techniques/background-
checks.aspx)</u> on prospective
employees? Have you ever had to
investigate a rumor of potential
employee misconduct? If so, when
was the last time you reviewed or
updated the forms required by the <u>Fair Credit Reporting Act (/hr/hr-best-
practices/recruiting-hiring-advice/job-screening-techniques/consumer-reporting-
agencies.aspx)</u> (FCRA)?



Now is the time to take a look at the procedures you have in place for background checks,
in advance of 2013 changes to the authorization forms that all employers must use.

In case you need a refresher, the FCRA says that any employer that uses an outside company (called a consumer reporting agency) to conduct an employee background check must:

- Provide the target of that check with certain notices.
- Obtain written authorization to conduct the investigation.

The Federal Trade Commission (FTC), which has previously overseen employment matters under the FCRA, has passed some of its authority to the Consumer Financial Protection Bureau (CFPB). This means that anyone who wishes to contest the outcome of an employee background screening (/hr/hr-best-practices/hr-events/past-hr-events/monster-background-screening-webinar.aspx) or get any other information regarding the check must contact the CFPB instead of the FTC.

Three important notices that are part of the background check process will help you understand the change of authority from the FTC to the CFPB:

- Consumer's Summary of Rights (http://www.employeescreen.com/university/wp-content/uploads/Summary-of-Your-Rights-20130101.pdf)
- Notice to Users of Consumer Reports of their Obligations (http://www.employeescreen.com/university/wp-content/uploads/Notice-to-Users-20130101.pdf )
- Notice to Furnishers of Information of their Obligations Under the FCRA (http://www.employeescreen.com/university/wp-content/uploads/Notice-to-Furnishers-20130101.pdf)

The main change to the forms is to explain how individuals and businesses can contact the CFPB. All employers must use the new forms in their background check procedures beginning January 2013.

**Read more: Employment Law: Small Business Updates** (/hr/hr-best-practices/small-business/news/employment-law.aspx)

---

## Related Articles

- Hiring Candidates with an Aptitude for Better Customer Service (/hr/hr-best-practices/small-business/hiring-process/better-customer-service.aspx)
- Social Media Advice from the DKNY PR Girl (/hr/hr-best-practices/small-business/social-media-trends/social-media-advice.aspx)
- Human Resource Management for your Small Company (/hr/hr-best-practices/small-business/hiring-process/human-resource-management.aspx)

 w 2013 Forms for Employee Background Checks | Mo    om

- Behavioral Interview Questions: Avoid These Three Mistakes (/hr/hr-best-practices/small-business/hiring-process/behavioral-interview-questions-to-avoid.aspx)
- Use Phone Interview Questions to Quickly Pinpoint Qualified Candidates (/hr/hr-best-practices/small-business/hiring-process/phone-interview-questions.aspx)

---

**M** (http://www.monster.com)

About Monster (http://www.monster.com/about) | Work for Monster (http://www.monster.com/about/work-for-us) | Partner with us (http://partner.monster.com/) | Using Monster (http://hiring.monster.com/hr/hr-best-practices/monster-training.aspx) | Occupational Trends (http://hiring.monster.com/hr/hr-best-practices/market-intelligence/occupational-reports.aspx) Investor Relations (http://ir.monster.com) | Social Media (http://career-services.monster.com/social-media/home.aspx) | Terms of Use (http://inside.monster.com/terms-of-use) | Privacy Center (http://inside.monster.com/privacy/home.aspx) | OFCCP Info (http://hiring.monster.com/hr/hr-best-practices/workforce-management/employee-benefits-management/OFCCP.aspx) | Help (http://monster-usen.custhelp.com/app/answers/list) | Security (http://inside.monster.com/security-center/home.aspx) | Contact Us (http://monster-usen.custhelp.com/app/ask) | Site Map (http://hiring.monster.com/sitemap.aspx)

Find us on Google+ (https://plus.google.com/+monster)

Copyright © 2015 | Monster Worldwide (http://www.monster.com/) (NYSE: MWW (http://finance.aol.com/quotes/monster-worldwide-inc/mww/nys))

U.S. Patents No. 5,832,497; 7,599,930 B1; 7,827,125 and 7,836,060 V: 2015.17.0.29-201-

# Exhibit 31

| Search Resource Center | 🔍 |
|---|---|

Home (/hr/hr-best-practices.aspx)
 / Recruiting and Hiring Advice (/hr/hr-best-practices/recruiting-hiring-advice.aspx)
 / Acquiring Candidates (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates.aspx)

# Think Before You Hire: Maintain a Legal Hiring Process

(http://oas.monster.com/RealMedia/ads/click_lx.ads/us.monster.en/hiring/legal-hiring-process/579332739/Middle1/default/empty.gif/7a2f7276726c5878683355414264387a?x)

**By: Melanie Berkowitz, Esq. (/hr/hr-best-practices/market-intelligence/writers/melanie-berkowitz.aspx)**



If you're assuming that a tight job market means that an employer doesn't have to exert much effort to fill its open positions, think again.

Knowing how to "hire smart" is a must for any employer, no matter what the economy looks like. A company that does not think strategically about recruiting could miss out on the best candidates, fail to hire a diverse workforce or worse - expose itself to liability for discriminatory hiring practices.

Now is the time to take a critical look at your hiring process to make sure it is efficient and effective. Remember: A little bit of common sense goes a long way toward hiring the best employees.

## What Do You Need in a New Employee?

The first step in your recruiting process should be to prepare a well thought-out job description that can be used for both hiring and employment purposes. When creating a job description, keep the following in mind:

- DO list the duties and responsibilities of the job, moving from general to specific. Example: "Will assist marketing department in creating promotional materials for new line of spa products. Duties include editing copy, writing press releases and contacting industry experts and media."

- DO state job qualifications and pre-requisites in an objective manner. Examples: "Must have bachelor's degree", "Must type 30 words per minute", "Must be proficient in PowerPoint and Quark."

- DO include language indicating that you are an "Equal Opportunity Employer" and that nothing in the job posting or description should be construed as an offer or guarantee of employment.

- DO NOT use language that states or suggests a preference for a particular gender, race, age or other such quality. Example: "Looking for a young, energetic team player." Both the words "young" and "energetic" suggest an age preference and is likely illegal. Better: "Looking for a hard-working team player."

## Attract Diverse and Qualified Applicants

Great workers can be found from a variety of sources, and the savvy employer will look to a number of them for its hiring needs. For example, recruit at a broad range of colleges and technical schools, attend minority-sponsored job fairs, utilize Monster's Diversity Products (http://hiring.monster.com/recruitment/Diversity-Inclusion.aspx), advertise in relevant community newspapers and if possible, seek partnerships with organizations that are a source of diverse employees.

As well, learn from companies that have a strong commitment to diversity (/hr/hr-best-practices/workforce-management/workplace-diversity/allstate-diversity-case-study.aspx). And keep in mind: unless your workforce is already diverse, relying heavily on recommendations from current employees will only maintain the status quo and will not help you increase diversity.

## Avoid Application and Interviewing Pitfalls

Has your company reviewed its job application forms with human resources or a lawyer in the past two years? If your organization is a Federal contractor, does it conform to the latest OFCCP standards (http://www.dol.gov/ofccp/iardwnld.htm) for accepting electronic

job applications? Do you regularly train your managers about proper interviewing techniques?

While answering "no" or "I don't know" to any of these questions doesn't mean your company is violating the law, failing to recognize and address common recruiting mistakes can open your company up to liability down the road.

Just as you do with your advertisements and job descriptions, review all applications with an attorney to make certain they are objective and do not ask for inappropriate information. For example, some state laws prohibit employers from considering an applicant's arrest record when making employment decisions, so a question about prior arrests should not be on the job application. Here are some other issues to consider and discuss with experienced employment counsel:

- Including a statement on the application that you are an "Equal Opportunity Employer"

- Including a statement on the application that it does not constitute a promise or guarantee of employment

- How to draft a separate document asking for approval to conduct a background check that conforms with the Fair Credit Reporting Act, if your company intends to perform such checks

- How to conform to OFCCP hiring (/hr/hr-best-practices/workforce-management/employee-benefits-management/OFCCP-compliance-evaluation.aspx) and recordkeeping guidelines, if your organization is a Federal contractor.

Personal interviews and employment applications are the most frequently used tools for selecting the best qualified candidates for employment. As with the application process, employers need to think critically about their interview procedure to make sure that every person involved in the process is familiar with the "do's and don'ts" of a legal and effective interview (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates/legal-job-interview-questions.aspx).

Remember, the law presumes that all questions asked on an employment application or in a personal interview will be used in the hiring decision. Therefore, it is important to limit interview topics to only those issues that are needed to evaluate an applicant's qualifications for the particular position. When training interviewers on proper techniques, include these suggestions:

- Try to ask open ended questions that will require the candidate to discuss his or her qualifications. Questions that only require a "yes" or "no" answer are not nearly as useful.

9/15/2015                    Look Before You Hire: Maintain a Legal Hiring Process | Monster.com

- Evaluate responses critically. Did the applicant answer the questions fully? Did he or she provide information to help evaluate his or her qualifications and experience?

- Do not make any promises or guarantees with regard to the job or future employment. For example, avoid comments such as "As long as you do a good job, you will always have a position with the company," or "You are by far the strongest candidate I've interviewed."

- The interviewer should take notes to help remember each applicant. The notes should be written on a piece of paper separate from the job application or resume and never indicate an applicant's race, age, national origin, gender, disability or other such identifier, either outright or by code. Such behavior can be discriminatory and illegal. It is essential to focus solely on whether the candidate meets the bona fide qualifications of the job.

- If possible, have more than one person interview each candidate.

- Regarding your employment applications – consider including EEO statement and a statement that the application is not an offer of employment or an employment contract.

*Legal Disclaimer: None of the information provided herein constitutes legal advice on behalf of Monster.*

---

## Related Articles

- How to Target Talent Efficiently with Customized Email (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates/how-to-target-talent.aspx)
- Staffing Trends: How Will 2015 Close Out? (/hr/hr-best-practices/recruiting-hiring-advice/strategic-workforce-planning/second-half-2015-staffing-trends.aspx)
- Attract Millennials with your Employer Branding (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/attracting-Millennials.aspx)
- The Importance of Mobile on the Job Apply Process (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/mobile-job-apply.aspx)
- You're Invited to a Monster Power Recruiter Workshop (/hr/hr-best-practices/recruiting-hiring-advice/attracting-job-candidates/power-recruiter-workshops.aspx)

 (http://www.monster.com)

About Monster (http://www.monster.com/about) | Work for Monster
(http://www.monster.com/about/work-for-us) | Partner with us (http://partner.monster.com/) | Using
Monster (http://hiring.monster.com/hr/hr-best-practices/monster-training.aspx) | Occupational Trends
(http://hiring.monster.com/hr/hr-best-practices/market-intelligence/occupational-reports.aspx)
Investor Relations (http://ir.monster.com) | Social Media (http://career-services.monster.com/social-
media/home.aspx) | Terms of Use (http://inside.monster.com/terms-of-use) | Privacy Center
(http://inside.monster.com/privacy/home.aspx) | OFCCP Info (http://hiring.monster.com/hr/hr-best-
practices/workforce-management/employee-benefits-management/OFCCP.aspx) | Help (http://monster-
usen.custhelp.com/app/answers/list) | Security (http://inside.monster.com/security-center/home.aspx)
| Contact Us (http://monster-usen.custhelp.com/app/ask) | Site Map
(http://hiring.monster.com/sitemap.aspx)

Find us on Google+ (https://plus.google.com/+monster)

Copyright © 2015 | Monster Worldwide (http://www.monster.com/) (NYSE: MWW (http://finance.aol.com/quotes/monster-
worldwide-inc/mww/nys))

U.S. Patents No. 5,832,497; 7,599,930 B1; 7,827,125 and 7,836,060 V: 2015.17.0.29-202-

# Exhibit 32

| Search Resource Center | 🔍 |
| --- | --- |

Home (/hr/hr-best-practices.aspx)
  / Workforce Management (/hr/hr-best-practices/workforce-management.aspx)
  / Employee Benefits (/hr/hr-best-practices/workforce-management/employee-benefits-management.aspx)

# Small Business Employment Guide: Five Important Laws to Know

(http://oas.monster.com/RealMedia/ads/click_lx.ads/us.monster.en/hiring/employment-laws/2065387186/Middle1/default/empty.gif/7a2f7276726c5878683355414264387a?x)

**By: Melanie Berkowitz, Esq. (/hr/hr-best-practices/market-intelligence/writers/melanie-berkowitz.aspx)**

The myriad of state and Federal laws that govern the workplace are complex. Understanding employment law can be confusing, whether you are a small business-owner, a new business-owner, or an employer who hasn't had a chance to review employment policies for a while.



Do you know enough to keep your employment policies (/hr/hr-best-practices/workforce-management/employee-benefits-management/employment-policies.aspx) in compliance to maintain a legal hiring process (/hr/hr-best-practices/recruiting-hiring-advice/acquiring-job-candidates/legal-hiring-process.aspx)? Take this short quiz to find out how well you understand several important legal issues that affect the workplace:

**True or False:**

1. Only companies that employ unionized employees have to comply with the National

Labor Relations Act.

2. An employee is not considered "disabled" if they have a medical condition that can be controlled with medication (i.e., epilepsy.)

3. If an employee asks for time off to "take care of some family issues" but does not request leave under the Family and Medical Leave Act, you are not required to provide FMLA leave.

4. When terminating a group of employees because of a reduction in force, you do not have to consider any special legal responsibilities towards those employees who are age 40 or over as long as you also terminate employees who are younger than 40.

5. If you intend to use an outside agency to perform background screening (/hr/hr-best-practices/hr-events/past-hr-events/monster-background-screening-webinar.aspx) on employees or job applicants, it's a good idea to add a request for consent to the bottom of your employment application forms.

Each of the statements includes at least one incorrect element. The correct answer to all five questions is "false." Small companies that may not have regular access to a labor and employment lawyer are particularly vulnerable to making mistakes with employment decisions.

Familiarity with laws that affect the workplace is important. Employers are encouraged to engage an attorney who is experienced in employment matters before making big decisions. Employment attorneys can also help draft and review employment policies to make sure your day-to-day interactions with your employees are lawful as well.

At the very least, small business owners (like all employers) need to recognize which Federal and state employment laws apply to them and maintain a basic understanding of each law's requirements. The resources listed below will help you get started.

**The National Labor Relations Act**
(http://www.nlrb.gov/about_us/overview/national_labor_relations_act.aspx ) (NLRA)

Many employers are surprised to learn that they are subject to the requirements of the NLRA even if they do not have any unionized employees. This is because the law protects far more employees than just those who are members of a union.

With only a few exceptions, the NLRA applies to all private employers who are engaged in interstate commerce. The NLRA guarantees the right of employees to organize (join a union) and bargain collectively with their employer, or to refrain from such

activity. Employers and unions have rights under the act
(http://www.nlrb.gov/Workplace_Rights/i_am_new_to_this_website/what_are_my_rights.asp)
as well.

The law is enforced by the National Labor Relations Board
(http://www.nlrb.gov/About_Us/Overview/fact_sheet.aspx) (NLRB.) Employers with one or
more employees are subject to the NLRA. Industries that are exempt
(http://www.nlrb.gov/workplace_rights/employees_or_employers_not_covered_by_nlra.aspx
) from NLRA requirements: airlines, railroads, agriculture and government.

**The Americans with Disabilities Act** (http://www.eeoc.gov/policy/ada.html) (ADA)

The ADA prohibits discrimination (http://www.eeoc.gov/types/ada.html) against "qualified
individuals with disabilities (http://www.eeoc.gov/facts/fs-ada.html)" in all employment
practices, including job application procedures, hiring, firing, advancement, compensation,
training, and other terms, conditions and privileges of employment. It applies to
recruitment, advertising, tenure, layoff, leave, fringe benefits and all other employment-
related activities. The definition of "disability" is very important because the law only
protects individuals who have a disability, which means they:

- Have a physical or mental impairment that substantially limits one or more major life
  activities;
- Have a record of such impairment; or
- Are regarded as having such impairment.

Any individual with an impairment that does not limit a major life activity
(http://www.eeoc.gov/policy/docs/902sum.html) is not considered disabled for the
purposes of the ADA. Employers have certain responsibilities
(http://www.eeoc.gov/types/ada.html) towards disabled employees, so knowing how to
determine if a worker is covered by the law is important.

The Act applies to all employers with 15 or more employees. Small employers can find
information about the ADA (http://www.eeoc.gov/ada/adahandbook.html) specific to
them on the EEOC's website.

A new amendment to the ADA went into effect January 1, 2009. The ADA Amendments
Act of 2008 (http://www.eeoc.gov/ada/amendments_notice.html) (ADAAA) makes a
number of changes to the law's definition of the word "disability." Among them, the ADAAA
clarifies that the determination about whether a person is disabled must be made without
considering any mitigating measures, such as medications that eliminate
symptoms. Therefore, an employee whose epilepsy is controlled by medication may still
be considered disabled if he or she meets the other requirements of the law.

The ADAAA emphasizes that the definition of disability should be construed broadly so that it covers individuals to the maximum extent permitted by the terms of the ADA. Therefore, any employer who has a question about whether an employee is disabled or what their duties are under the law should consult with an employment attorney.

## Family and Medical Leave Act (http://www.dol.gov/esa/whd/fmla/fmlaAmended.htm ) (FMLA)

The FMLA is one of the most complex and misunderstood employment laws. Generally, it requires covered employers to grant an eligible employee up to a total of 12 work weeks of unpaid leave during any 12-month period for one or more of the following reasons:

- The birth and care of the newborn child of the employee;
- Placement with the employee of a son or daughter for adoption or foster care;
- Care for an immediate family member (spouse, child, or parent) with a serious health condition;
- Taking of medical leave when the employee is unable to work because of a serious health condition.

The FMLA applies to private, state and local government, and some Federal employers who have at least 50 employees within 75 road miles of each other (for example, in two locations, 30 miles apart.) Determining when and if an employee is eligible for FMLA leave can be difficult. An employee does not need to specifically mention the FMLA by name to put an employer on notice that he or she may be eligible for leave under the law, and the employer has a number of burdens to obtain and verify medical information about an employee requesting medical leave.

To assist employers, the Department of Labor has issued an overview of the law (http://www.dol.gov/esa/whd/fmla/ ) and a number of compliance assistance materials. (http://www.dol.gov/compliance/laws/comp-fmla.htm#CA_Materials ) These materials include a poster (http://www.dol.gov/esa/whd/regs/compliance/posters/fmla.htm ) that employers must post at their workplaces and fact sheets (http://www.dol.gov/esa/whd/regs/compliance/whdfs28.pdf ) about the law.

In 2009, the FMLA was amended (http://www.dol.gov/esa/whd/fmla/finalrule.htm ) to include additional rules (http://www.dol.gov/federalregister/PdfDisplay.aspx?DocId=21763) about granting leave for employees who need to care for family members who were injured in the course of military service.

## Age Discrimination in Employment Act (http://www.eeoc.gov/policy/adea.html ) (ADEA)

The ADEA protects (http://www.eeoc.gov/facts/age.html ) individuals who are 40 years of age or older from employment discrimination (http://www.eeoc.gov/types/age.html ) based on age. The law applies to employers with 20 or more employees and covers private employers as well as state, local and Federal government.

Only in rare circumstances, when age is a "bona fide occupational qualification" (BFOQ), may an employer take age into account when hiring or promoting an employee. Most BFOQs arise because of safety concerns. For example, it is lawful to place a limit on the age of airline pilots.

When an employer terminates an employee or employees who are age 40 or older, it may have certain additional legal responsibilities (http://www.eeoc.gov/policy/docs/qanda_severance-agreements.html) toward them even if the employer terminates younger employees at the same time. These requirements occur if the employer wishes to offer the terminated employee(s) additional money or benefits in exchange for a release (or "waiver") of liability for all claims connected with the employment relationship, including discrimination claims under the ADEA.

**The Fair Credit Reporting Act (http://www.ftc.gov/os/statutes/031224fcra.pdf )** (FCRA)

The FCRA is a complex statute that promotes the accuracy, fairness and privacy of consumers' credit information and credit history. For employment purposes, that includes making sure that an employer does not conduct a background check on any job applicant or employee without complying with a number of requirements (http://www.ftc.gov/bcp/edu/pubs/business/credit/bus08.shtm ).

All individuals, including employees and job applicants have a number of rights under the FCRA (http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre35.pdf). While it is true that an employer cannot use an outside company to conduct a background check on an employee or job applicant without first getting his or her consent, the consent form must be on a separate document from the job application.

*Legal Disclaimer: None of the information provided herein constitutes legal advice on behalf of Monster.*

## Related Articles

- The Deflategate Drama Offers a Few Lessons in Leadership (/hr/hr-best-practices/workforce-management/hr-management-skills/deflategate-leadership.aspx)
- Authentic Leadership: An Interview with Bill George (/hr/hr-best-practices/workforce-management/hr-management-skills/authentic-leadership.aspx)

- Leadership Styles: Becoming an Authentic Leader (/hr/hr-best-practices/workforce-management/hr-management-skills/leadership-styles-bill-george.aspx)
- Workplace Wellness Programs that Work for Everyone (/hr/hr-best-practices/workforce-management/employee-performance-management/workplace-wellness-programs.aspx)
- Workers' Wages Rise, But Will Their Spirits Follow? (/hr/hr-best-practices/workforce-management/employee-performance-management/hourly-wages.aspx)

---

 (http://www.monster.com)

About Monster (http://www.monster.com/about) | Work for Monster (http://www.monster.com/about/work-for-us) | Partner with us (http://partner.monster.com/) | Using Monster (http://hiring.monster.com/hr/hr-best-practices/monster-training.aspx) | Occupational Trends (http://hiring.monster.com/hr/hr-best-practices/market-intelligence/occupational-reports.aspx) Investor Relations (http://ir.monster.com) | Social Media (http://career-services.monster.com/social-media/home.aspx) | Terms of Use (http://inside.monster.com/terms-of-use) | Privacy Center (http://inside.monster.com/privacy/home.aspx) | OFCCP Info (http://hiring.monster.com/hr/hr-best-practices/workforce-management/employee-benefits-management/OFCCP.aspx) | Help (http://monster-usen.custhelp.com/app/answers/list) | Security (http://inside.monster.com/security-center/home.aspx) | Contact Us (http://monster-usen.custhelp.com/app/ask) | Site Map (http://hiring.monster.com/sitemap.aspx)

Find us on Google+ (https://plus.google.com/+monster)

Copyright © 2015 | Monster Worldwide (http://www.monster.com/) (NYSE: MWW (http://finance.aol.com/quotes/monster-worldwide-inc/mww/nys))

U.S. Patents No. 5,832,497; 7,599,930 B1; 7,827,125 and 7,836,060 V: 2015.17.0.29-209-

**SUM-100**

## SUMMONS
### (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

TalentBin, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Eric Halvorson, Laura Ferrer, Peter Dallman, Robert Grana, Dennis
Bulcao, and Neil Young, individually, as representatives of the classes,
and on behalf of the general public,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| | |
|---|---|
| The name and address of the court is:<br>(El nombre y dirección de la corte es): San Francisco County Superior Court<br><br>400 McAllister Street, San Francisco, CA 94102 | CASE NUMBER:<br>(Número del Caso):<br><br>CGC 15 548270 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Matthew Helland, One Embarcadero Ctr, Ste 720, San Francisco, CA 94111, 415-277-7235

| | | |
|---|---|---|
| DATE: OCT – 2 2015<br>(Fecha) | Clerk, by CLERK OF THE COURT<br>(Secretario) Ronnie Otero | , Deputy<br>(Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☑ on behalf of (specify): TalentBin, Inc.

   under: ☑ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
   ☐ other (specify):
4. ☐ by personal delivery on (date):

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 485
www.courtinfo.ca.gov